THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* PATRICIA HANCOCK, Defendant-Appellant.

First District (1st Division)   No. 81—1028

Opinion filed March 31, 1983.

Elizabeth Clarke, of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Bruce A. Cardello, and Louis F. Stalzer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Defendant Patricia Hancock was convicted in a bench trial of murder and was sentenced to 30 years. On appeal, defendant raises the following issues: (1) whether the arrest of defendant was without probable cause which would require the suppression of subsequent statements made to the police; (2) whether defendant's statement to the police was involuntary; (3) whether the trial court was required to admonish defendant pursuant to Supreme Court Rule 402; (4) whether defendant was denied her right to effective assistance of counsel; (5) whether the evidence established defendant's guilt beyond a reasonable doubt; and (6) whether defendant's sentence was excessive.

The record discloses that Patricia Hancock was charged by indictment with two counts of murder. The indictment alleged that on April 30, 1980, defendant threw Ronald Sheffield, her seven-month-old son, into a lagoon, which resulted in the drowning of the child.

Defendant filed two motions to suppress statements on the grounds that the statements were involuntary. Defendant also filed a motion to quash her arrest on the grounds that the police lacked probable cause to arrest her without a warrant.

At the suppression hearing, Officer Gerald Smith of the Chicago police department testified that at approximately 11:30 p.m. on April 30, 1980, he and his partner responded to a call for help at 7705 S. Eggleston Street in Chicago. The two officers were directed to a nearby lagoon in Auburn Park where they observed defendant standing. Defendant told the officers that someone had thrown her child into the lagoon. After the body of the infant was recovered from the lagoon, defendant and the child were taken to a hospital. Smith stated that he and other officers viewed defendant as being a victim and that there were no restrictions which were placed upon her.

Detective John Yucaitis testified that he arrived at the hospital at approximately 1 a.m. on May 1 and that he spoke with defendant. Yucaitis stated that he also spoke with defendant at 4:30 a.m. At both times, Yucaitis viewed defendant as a victim.

Assistant State's Attorney Richard Loftus first spoke with defendant at approximately 1:15 a.m. on May 1 and again at 1:45 a.m. Both of these conversations occurred at the hospital. He next spoke with defendant at approximately 2 a.m. on May 1 at Auburn Park. Loftus also had another conversation with defendant at 3 a.m. at Auburn Park. Detective John Solecki stated that at approximately 1 a.m. on May 1, he and his partner took defendant to Auburn Park so that she could reenact the events of the prior evening. He stated that defendant screamed very loudly in her reenactment. Solecki indicated

that defendant's demeanor was normal and that she did not complain of being tired or in need of food or medication.

At 4:30 a.m. Assistant State's Attorney Loftus spoke with defendant at the police station. After his conversation with defendant, she was left alone until approximately 9 a.m. at which time Loftus returned and found defendant in the same interview room. At approximately 9:15 a.m. on May 1, Detective Yucaitis advised defendant of her *Miranda* rights and placed defendant under arrest.

Richard O'Brien stated that he administered a polygraph examination to defendant at approximately 10:15 a.m. on May 1. Defendant was given her *Miranda* warnings and executed a waiver of liability. O'Brien stated that he observed no emotional response from defendant when he questioned her. He testified that he was led to conclude that there was no response because of the "recency of events and the subject's possible fatigue." He stated that he observed defendant yawn during the examination. Defendant told O'Brien that she had slept periodically the day before and that she had taken a nap between 6 and 8 p.m. on April 30. Defendant also told O'Brien that she was not taking any medication.

Detective Dennis McGuire stated that upon leaving the polygraph examination, he stopped at a fast-food restaurant. Defendant declined McGuire's invitation to eat lunch. They arrived at the police station between 1 and 2 p.m. on May 1. Defendant did not complain of being tired or in need of medication.

Assistant State's Attorney Michael Spivack spoke with defendant at 3:15 p.m. on May 1. He advised defendant of her rights and defendant stated that she wished to waive her rights and make a statement. Defendant did not complain of being tired or hungry. Spivack described defendant as being calm and alert.

At 9:30 p.m. on May 1, Assistant State's Attorney Loftus spoke with defendant at the police station. He observed defendant asleep on a chair in the interview room at 12:30 a.m. Defendant was awakened after 30 minutes of sleep and at 2 a.m. on May 2, defendant was taken to the lagoon in Auburn Park. Upon returning from the lagoon, defendant gave a statement in the presence of a court reporter. After the statement had been typed, the witness was given the statement to review and to make any corrections. Loftus stated that defendant did not complain of being tired, hungry or in need of medication. Loftus stated that defendant appeared to have slept and that there was a bag of chicken in the interview room.

Ronald Sheffield stated that he was the father of the deceased infant and that he had lived with defendant for more than a year. He

testified that the police would not permit him to see defendant when he requested to do so. He testified that he had left the police station at 7 a.m. on May 1 and that prior to that time, he had not been permitted to leave. He did not see defendant sleeping and he did not observe any food being brought to defendant. At approximately 4:30 p.m. on May 1, he brought chicken to the police station for defendant and one of the police officers gave the food to defendant. He also stated that on May 1, defendant was taking medication called teathallithium.

Following the close of the evidence, the court ruled that the statement given by defendant was not involuntary based upon its consideration of the totality of the circumstances. The court noted that defendant was confined approximately 30 hours, beginning on April 30 at 11:20 p.m. and ending on May 2 at 4:30 a.m. The trial judge stated that for 10 of the 30 hours, defendant was treated as a victim, rather than a suspect. He indicated that she was offered food and drink and that she had the opportunity to sleep if she wished. The court further stated that there was no showing that defendant was subjected to constant questioning by the State. The court then denied defendant's motion to suppress the statement. Following the court's ruling, defense counsel withdrew defendant's motion to quash her arrest.

The matter then proceeded to trial before the court. All evidence introduced at trial was by stipulation. It was stipulated that Ronald Sheffield, the deceased son of defendant, was alive at 10 p.m. on April 30, 1980, and was dead at midnight on May 1, 1980. Stipulations were entered that two persons were at Auburn Park at approximately 11 p.m. on April 30 when they heard a woman state that two men dressed in white threw her child into the lagoon. It was stipulated that defendant told two police officers that three men approached her. One of the men grabbed defendant, one took her child and the third man told defendant that he was going to rape her. Defendant also told the officers that when she reached for the child, she was knocked down and that the man with her child threw the infant into the lagoon and fled.

It was also stipulated that defendant provided officers with the descriptions of two men. The parties stipulated that the body of the child was recovered from the lagoon and that defendant went to the hospital with the child. At the hospital, defendant made no response when she was asked what had happened. A stipulation was entered that the cause of death was by drowning.

It was further stipulated that a person who identified herself as

defendant's sister had accused defendant of not wanting the child and that defendant made no response. A stipulation was entered that defendant's clothing was not soiled, although she claimed that she had been thrown to the ground by one of the alleged assailants. The defendant claimed that she had bruises on her arm to prove that she had been grabbed, but that the police officers observed only two scratch marks which appeared to be several days old. The defendant told two officers that the two men did not say anything to her at the time that her child was taken from her and she denied previously stating that one of the men threatened to rape her. It was stipulated that defendant told the officers that she did not go into the lagoon to save her child because if she had gone into the water, her clothing would be wet and the police would think that defendant was responsible for her child's death.

A stipulation was entered that a police officer located a robbery case report of April 28, 1980, in which the victim was defendant. In the robbery report, defendant's descriptions of the offenders were similar to the descriptions given to the police in this case. When defendant was asked about the similarities, she told the police that the assailants were the same on both occasions. When asked why she had not previously mentioned this, she stated that she did not want to "finger" the men. It was further stipulated that witnesses stated that defendant told them that the two men were dressed in white, but that she described dark clothing to the police. Defendant denied that she had stated that the offenders wore white clothing.

A stipulation was entered as to a conversation between Assistant State's Attorney Michael Spivack, Detective Dennis McGuire and defendant. It was stipulated that defendant was first advised of her *Miranda* rights and that defendant was asked if she wanted to discuss the events of April 30. In this conversation, defendant stated that she left her home with her seven-month-old son at approximately 11 p.m. on April 30, 1980, to purchase a pack of cigarettes. As she was walking with the infant, two men approached her. She described both men to Spivack and McGuire and told them that she recognized the men. Defendant also stated that she thought the two men were the ones who had robbed her, but that she was not certain. She stated that one man grabbed the child and put the child in the lagoon. The other man told defendant to "shut up," grabbed her by the coat and threw her to the ground. At this point, defendant screamed and the two men fled. It was stipulated that defendant told Spivack and McGuire that she was screaming and crying when she told a woman that someone threw her child into the lagoon. Defendant stated that

she never told anyone that the men had tried to rape her. She also stated that she loved the child and that she never beat the infant.

A stipulation was entered that a man who was watching television in his home which was less than 100 feet from Auburn Park did not hear anyone scream during the course of the evening of April 30, 1980. It was stipulated that on the evening of April 30, 1980, a woman was in her home near Auburn Park and that the first unusual event of the evening was the arrival of the police and fire department. The woman did not hear anyone scream prior to that time.

The testimony of Detectives Mosher and Tusello of the Chicago police department was stipulated. It was stipulated that at approximately 4:15 a.m. on May 1, 1980, defendant volunteered that no one believed her and that she should have fabricated a story that her infant fell into the lagoon. At approximately 5:45 a.m. on the same morning, defendant informed the detectives that she wanted to tell them what had really occurred. She told the officers that she met a person named Larry at the lagoon and that they sat on the wall of the bridge and passed the infant between them. She stated that the child fell into the lagoon. When asked by Larry what she intended to do, she told him that she would tell the police that she was attacked by two men who threw the child into the lagoon. Defendant then went to a woman who was in a car and asked her to call the police. It was further stipulated that defendant told the detectives that she met Larry at a lounge on April 28, 1980, and that a barmaid named Mattie knew Larry.

A stipulation was entered that Assistant State's Attorney Richard Loftus and Detective Mosher would testify to a conversation with defendant at 11:15 p.m. on May 1, 1980. Defendant was given her *Miranda* warnings. Defendant told the two men that she had lied to police officers in her story concerning the two attackers and that she now wished to tell another version. The stipulation indicated that this version of the events was similar to a written statement which defendant subsequently made. It was stipulated that defendant was taken to Auburn Park between 1 a.m. and 2 a.m. with Detectives Yucaitis and Leracz. At that time, Loftus, Yucaitis and Leracz went to 7705 S. Eggleston, while two other officers took defendant to the bridge over the Auburn Park lagoon.

It was stipulated that Investigators Martin and Solecki stood on the bridge over the lagoon with defendant and asked that she yell as she did at the time her infant was dropped into the water. A stipulation was entered that while standing outside 7705 S. Eggleston, Loftus, Yucaitis and Leracz clearly heard defendant's scream. The loca-

tion at which defendant and Larry were seated on the bridge was identified and the point at which the child was dropped was eight to 10 feet above the water.

It was further stipulated that defendant made a statement upon returning to the police station. The statement was then published. The statement repeated the version of events in which defendant met Larry at the lagoon and that the child had been accidentally dropped while being passed between the two. In her statement, defendant was described as screaming and calling for help.

A stipulation was entered that Mattie, the barmaid who defendant claimed knew Larry, would testify that she did not know Larry or anyone fitting the description of Larry. It was also stipulated that another woman would testify that she and her friend were sitting in a car near Auburn Park on April 30, 1980, at approximately 11 p.m. when she saw a woman carrying a child walk past the car. The woman would testify that a short while later, defendant approached her car and requested that the woman call the police because someone threw her child into the lagoon. The woman described defendant's voice as "calm." The woman also would testify that she would have heard any screams and that, aside from defendant, she did not notice anyone else on the street.

Following closing arguments, the court found defendant guilty of murder. The court stated that the evidence was circumstantial, but that the evidence excluded every reasonably possibility of defendant's innocence. The court sentenced defendant to a term of 30 years. Defendant appeals.

Defendant first argues that she was unlawfully held for 30 hours until she had given the police certain statements. She maintains that there was no probable cause to arrest her at the time she was taken into custody and that, therefore, the statements obtained from her should be suppressed. (See *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.) Defendant also cites *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103, *cert. denied* (1982), 459 U.S. ___, 74 L. Ed. 2d 143, 103 S. Ct. 174, in which the supreme court held that an interrogation over the course of 12 hours without probable cause violated defendant's fourth amendment rights and that, therefore, the statement which defendant gave to the police should be suppressed. Defendant also contends that the trial court erred in concluding that her statement was voluntary.

■ As to defendant's contention that the police lacked probable cause to arrest defendant, the record discloses that subsequent to the court's denial of defendant's motion to suppress her statement, de-

fense counsel withdrew the motion to suppress defendant's arrest. Therefore, there was no burden placed upon the State to come forward with evidence to establish whether defendant's arrest was supported by probable cause. As in *People v. Calderon* (1981), 101 Ill. App. 3d 469, 476, 428 N.E.2d 571, 575, a case which raises a similar issue, "it is not possible for us to say what the full evidence might have been had the State been required to justify the arrest." Since the issue of whether defendant's arrest was supported by probable cause was never developed through the presentation of evidence, our consideration of this issue would be purely speculative and, therefore, we decline to consider this issue. See *People v. Calderon.*

Defendant next argues that the trial court should have suppressed defendant's statement because it was not voluntary because she was extensively questioned over a period of 30 hours. Defendant points to the conclusion of the polygraph examiner who opined that defendant was not in a proper state of mind to submit to a polygraph examination, but that the court found that she was in a proper frame of mind 17 hours later. Defendant maintains that it is difficult to support the court's finding in this case because during the 17-hour period, defendant was subjected to "intense interrogation." Defendant also contends that she was questioned in "relays" by the police and the intense questioning and the lack of sleep overcame her free will.

■ In determining whether a statement given is voluntary, it is necessary to establish the totality of the circumstances surrounding the statement. (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.) The test which has been used is "whether [a statement] has been made freely, voluntarily and without compulsion or inducement of any sort or whether defendant's will was overcome at the time he confessed." (*People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, 606.) In determining whether a statement is voluntary, the trial court need not be convinced beyond a reasonable doubt that the statement is voluntary. (*People v. Lopez* (1981), 93 Ill. App. 3d 152, 416 N.E.2d 1127.) Additionally, the finding of the trial court will not be disturbed on appeal unless the finding is contrary to the manifest weight of the evidence. (*People v. Prim; People v. Lopez.*) At the time the trial court ruled on defendant's motion to suppress the statement, the court noted that there was testimony from the witnesses that defendant appeared to be alert and responsive at all times and that she did not complain about being tired, in need of food or drink or in need of medication. The trial judge stated that defendant had taken naps on occasion. The court also noted that it was satisfied that the State had

met its burden of establishing that the statement was voluntary. Based upon our review of the record and the arguments of the parties, we conclude that the finding of the trial court that defendant's statement was voluntary is not contrary to the manifest weight of the evidence and, therefore, there was no error in the court's denial of defendant's motion to suppress the statement.

Defendant next urges that Supreme Court Rule 402 (87 Ill. 2d R. 402) requires the court to give certain admonishments to defendant where defendant pleads guilty to an offense. Defendant contends that the stipulated bench trial in the instant case is equivalent to a guilty plea and that, therefore, the court committed reversible error when it failed to give her the required admonishments.

■ In *People v. Fair* (1975), 29 Ill. App. 3d 939, 332 N.E.2d 51, and *People v. Ford* (1976), 44 Ill. App. 3d 94, 357 N.E.2d 865, it was held that where there is a stipulation as to the evidence which would be presented and defendant preserves an actual or purported defense to the offense charged, admonitions pursuant to Supreme Court Rule 402 (87 Ill. 2d R. 402), are not required. We consider these cases to be controlling in the instant appeal. Defendant only stipulated to the evidence presented, not her guilt or that the evidence was sufficient to establish her guilt. Additionally, defendant also preserved her legal defense that the trial court erred in denying her motion to suppress the statement given to police. Therefore, the court did not err in its failure to provide defendant with the admonishments required by Supreme Court Rule 402. See also *People v. Daminski* (1980), 80 Ill. App. 3d 903, 400 N.E.2d 708.

Defendant argues that she was denied her right to effective assistance of counsel because her counsel failed to make a motion to contest a violation of her fourth amendment rights which occurred when she was arrested without probable cause. She maintains that had this motion been made, her statement to the police would have been suppressed and that the outcome of the trial would have been changed.

■ The test for determining whether defendant was denied her right to effective assistance of counsel is whether defendant's attorney was actually incompetent and caused substantial prejudice to defendant such that the outcome of the case was probably changed. (*People v. Talley* (1981), 97 Ill. App. 3d 439, 422 N.E.2d 1084.) In evaluating the representation afforded defendant, it is necessary to examine the totality of counsel's conduct. (*People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677.) Additionally, errors in judgment or trial strategy do not establish the incompetency of counsel. From the

record, it appears that counsel's decision to withdraw the motion to suppress defendant's statement on the grounds that it was the fruit of an unlawful arrest was a tactical decision which counsel made. We cannot conclude that the decision to withdraw the motion rendered his assistance to defendant ineffective. Further, the failure of counsel to make a motion does not result in counsel's assistance to be deemed *per se* ineffective. (See *People v. Reppa* (1982), 104 Ill. App. 3d 1123, 433 N.E.2d 1091.) Accordingly, we hold that defendant was not denied her right to effective assistance of counsel.

Defendant next urges that the evidence failed to establish her guilt of murder beyond a reasonable doubt. Section 9—1(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)) states, in pertinent part:

"A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; ***."

The evidence which resulted in defendant's conviction was entirely circumstantial. Where the only evidence of a homicide is circumstantial, the guilt of the accused must be thoroughly established so as to exclude every other reasonable hypothesis. (*People v. Lewellen* (1969), 43 Ill. 2d 74, 250 N.E.2d 651.) The stipulated evidence offered at trial failed to satisfactorily establish the requisite mental state necessary to sustain a conviction for murder. At trial, it was stipulated that if a person who identified herself as a sister of defendant was called to testify, she would state that she accused defendant of never wanting the child and that defendant did not respond to the accusation. It appears that this was the only evidence which might be considered probative of defendant's mental state. During the hearing on defendant's post-trial motion, the State conceded that they were not certain of the person involved in the foregoing conversation or of whether the State could have produced such a witness. The record in this case leaves a reasonable doubt as to whether defendant possessed the requisite mental state to be guilty of murder.

The evidence in this case indicates that defendant was guilty of involuntary manslaughter, which is a lesser included offense of murder. (*People v. Suerth* (1981), 97 Ill. App. 3d 1005, 423 N.E.2d 1185.) Section 9—3(a) of the Criminal Code of 1961 (Ill. Rev. Stat.

1979, ch. 38, par. 9—3(a)) states in pertinent part:

"A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly ***."

It has been stated that the crux of the offense of involuntary manslaughter is recklessness. (*People v. Simpson* (1978), 74 Ill. 2d 497, 384 N.E.2d 373.) Involuntary manslaughter does not require felonious intent as does murder; rather, the only mental state required for involuntary manslaughter is the conscious disregard of a substantial and unjustifiable risk. *People v. Suerth; People v. Johnson* (1979), 70 Ill. App. 3d 149, 388 N.E.2d 225.

As we previously noted, the evidence in this case does not establish, beyond a reasonable doubt, defendant's felonious intent. We are satisfied, however, that the evidence in this case proves beyond a reasonable doubt that defendant's conduct involved the wanton and reckless doubt that defendant's conduct involved the wanton and reckless disregard for the welfare, safety and life of her infant son. It appears from the record that the death of her son occurred because of defendant's reckless conduct. Accordingly, defendant's conviction for murder is reduced to the lesser included offense of involuntary manslaughter.

Defendant's final contention is that the sentence imposed is excessive. Since we have concluded that the evidence failed to establish beyond a reasonable doubt defendant's guilt of murder, but that it was sufficient to establish her guilt of involuntary manslaughter, it is necessary to remand this action to the trial court for an appropriate sentence.

Accordingly, the judgment of the circuit court of Cook County is affirmed in part and reversed and remanded in part for further proceedings consistent with this opinion.

Judgment affirmed in part; reversed and remanded in part.

McGLOON and GOLDBERG, JJ., concur.