THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
STEVEN WAYNE HOLMES, Defendant-Appellant.

Third District   No. 3—92—0052

Opinion filed May 12, 1993.—Modified on denial of
rehearing July 28, 1993.

McCUSKEY, P.J., dissenting.

Mark D. Fisher, of State Appellate Defender's Office, of Ottawa, for appellant.

Kevin W. Lyons, State's Attorney, of Peoria (John X. Breslin and Terry A. Mertel, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BARRY delivered the opinion of the court:

A jury convicted the defendant, Steven Wayne Holmes, of murder (720 ILCS 5/9—1(a)(2) (West 1992)). He was thereafter sentenced to 70 years' imprisonment. He appeals, and we reverse and remand.

The record shows that the defendant shook his seven-month-old daughter Crystal, thereby causing her death. While the defendant admitted he shook his daughter, he testified that he did not intend to

hurt her, and he did not *know* that shaking her could hurt her. The defendant also stated that he had a seventh-grade education.

The defendant's wife, Janelle Holmes, also testified that the defendant shook Crystal but that he was not trying to hurt her. The record also shows that prior to the trial Janelle gave a statement to the police regarding the incident that was inconsistent with her trial testimony. However, in her statement to the police she never stated that the defendant intended to hurt Crystal.

Crystal's treating doctors opined that Crystal had been vigorously shaken, which caused her brain to swell and inhibited blood flow to the brain. They both agreed that the brain injury and her death resulted from a one-time shaking incident.

Other evidence showed that Crystal had prior injuries which were indicative of a pattern of child abuse. However, the evidence presented does not prove that these prior injuries were caused by the defendant's shaking. At trial, the defendant objected to the admission of these other incidents of abuse. He claimed that the State could not show that he inflicted these prior injuries.

The defendant reiterates that argument on appeal, and he also claims that his trial counsel was ineffective for failing to request a limiting instruction. That is, the jury should have been advised that it could not consider the prior incidents of abuse for any other purpose than the purpose for which they were admitted.

The jury found the defendant guilty of first degree murder. On appeal, the defendant first argues that he was not proved guilty of murder beyond a reasonable doubt. Specifically, he contends that the evidence was insufficient to show that the defendant knew that shaking Crystal would cause death or great bodily harm. As such, he asks this court to reverse his conviction, or, in the alternative, to reduce his conviction from first degree murder to involuntary manslaughter. He concedes that the evidence was sufficient to support a conviction for involuntary manslaughter.

A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death, he knows that such acts create a strong probability of death or great bodily harm. (720 ILCS 5/9—1(a)(2) (West 1992).) Upon judicial review of a conviction, a reviewing court will preserve the trier of fact's role as weigher of the evidence by viewing the evidence in the light most favorable to the prosecution. The relevant question is whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.

After reviewing the evidence in light of the above principles, we conclude that a rational trier of fact could not have found the defendant guilty of first degree murder. Here, the evidence was insufficient to show that the defendant knew his actions could cause death or great bodily harm.

The evidence showed that the defendant had only a seventh-grade education and that the death was caused by a one-time shaking. The defendant testified that he did not know shaking a child could kill a child. In addition, the defendant and his wife both testified that he did not intend to harm Crystal. Furthermore, no evidence was introduced by the State which showed that the defendant knew his actions could cause Crystal's death. As such, we find that the State's evidence was insufficient to prove, beyond a reasonable doubt, that the defendant knew his actions could cause death or great bodily harm.

However, we are satisfied that the evidence in this case proved beyond a reasonable doubt that the defendant was guilty of involuntary manslaughter, a lesser included offense of murder. We therefore find that the defendant's murder conviction should be reduced to involuntary manslaughter.

In support of our finding, we may reduce the degree of the offense of which the defendant was convicted. (134 Ill. 2d R. 615(b)(3).) This rule allows the appellate court to reduce the offense of which a defendant is convicted to a lesser offense where the evidence failed to prove beyond a reasonable doubt an element of the greater offense. *People v. Kick* (1991), 216 Ill. App. 3d 787, 576 N.E.2d 395.

A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts, whether lawful or unlawful, which cause the death are likely to cause death or great bodily harm to some individual, and he performs them recklessly. (720 ILCS 5/9—3 (West 1992).) The crux of the offense of involuntary manslaughter is recklessness. Unlike murder, involuntary manslaughter does not require felonious intent; rather, the only mental state required is the conscious disregard of a substantial and unjustifiable risk. *People v. Hancock* (1983), 113 Ill. App. 3d 564, 447 N.E.2d 994.

As previously noted, the evidence in this case does not establish, beyond a reasonable doubt, that the defendant knew, or intended, that his actions could or would cause death or serious harm. However, it does establish beyond a reasonable doubt that the defendant is guilty of involuntary manslaughter since the evidence shows that the defendant acted recklessly and with a conscious disregard of a substantial risk.

We note that the defendant raised two additional errors on appeal. However, due to our disposition of the first issue we find that these alleged errors, if they occurred, were harmless since the evidence overwhelmingly established the defendant's guilt of involuntary manslaughter. See *People v. Bryant* (1983), 94 Ill. 2d 514, 447 N.E.2d 301.

Accordingly, the judgment of the circuit court of Peoria County is reversed and the defendant's conviction for first degree murder is reduced to involuntary manslaughter. The cause is remanded for resentencing.

Reversed and remanded.

STOUDER, J., concurs.

PRESIDING JUSTICE McCUSKEY, dissenting:

I respectfully dissent. The appropriate standard of review in a criminal case was correctly set forth by the majority when it said: "Upon judicial review of a conviction, a reviewing court will preserve the trier of fact's role as weigher of the evidence by viewing the evidence in the light most favorable to the prosecution. The relevant question is whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267." 246 Ill. App. 3d at 180.

However, after reviewing the record, it is clear the majority failed to review the evidence in the light most favorable to the prosecution. Also, the majority has ignored the fact that on the day of the incident, the defendant lied to the paramedics and the police. Furthermore, the defendant lied again when he testified in his own defense at trial.

Pursuant to the *Collins* standard, a criminal conviction will not be set aside unless the evidence presented at trial is so improbable or so unsatisfactory that it creates a reasonable doubt of the defendant's guilt.

My review of the evidence indicates that the evidence presented at trial was neither improbable nor unsatisfactory. Instead, quite to the contrary, I believe that the evidence was sufficient to sustain the defendant's conviction for first degree murder.

The defendant told paramedic Clark Anderson that the victim slipped from his hands and fell onto the bed, then to the bassinet before striking the floor. The defendant told other paramedics that

the victim was crying and he went to pick her up. The defendant said he lost control of the child when she threw her arms up. The defendant told Officer Orlando Allen, on the date of the incident at the hospital, that the baby was crying and he picked her up when she jerked, fell out of his arms, hit the bassinet and the floor. The defendant denied that he was angry on the date of the incident or that he shook the victim hard.

The defendant changed his story during the trial. He took the stand and testified that the baby was in the bassinet when his wife left for work. He said he heard the baby crying and picked her up. The defendant said the child pushed away from him and fell backwards, bouncing between the bed and the bassinet. When he picked her up, she closed her eyes and looked like she was losing consciousness so he shook her. According to the defendant, he had no intent to injure the child when he shook her. He said he shook the child perhaps three times and then called 911.

After reviewing the extensive medical testimony presented during trial combined with the defendant's wife's statement, it is clearly evident that the defendant has never yet told the truth about his daughter's death. The defendant's wife gave the following statement to the police at the hospital on the day of the incident.

"Q. Do you have knowledge of this incident?

A. This morning we got up. I heard the baby crying this morning. He got up and took her out of bed. He said he changed her diaper, and I heard her crying; so I got out of bed and asked him what the hell was going on. I asked him if he fed her yet, and he said, 'Fuck no I didn't.' I asked him why not. And he said because I was a bitch. So I went in, fixed her a bottle, and began to feed her. He snatched the bottle out of her mouth, and so I picked her up and tried to calm her down. And then I had to go downstairs to get my clothes out of the dryer. I took the baby with me down there. We came back upstairs, went into the bedroom. We got dressed. He came in there and snatched her out of my arms, said she wanted her dad instead of her mom. So I followed them out to the front room, tried to take her from him. He set her on the floor. I go sit in the chair. Then he called me a fuck'n bitch and slung the bottle at me. Then that's when he kicked me in the gut. The baby's food is still all over me. I didn't have time to clean it up.

Q. Where was the baby at this time?

A. She was sitting on the floor crying.

Q. Did Steven do anything to Crystal at that time?

A. He just picked her up and shook her and told her she better stopped crying.

Q. How hard did he shake her?

A. Pretty hard, made her feel it. She stopped crying. It scared her more than anything.

Q. What was his exact words he stated to the baby?

A. Fuck'n shut up. Fuck'n shut up. Fuck'n shut up.

Q. While he was saying that, did he continue to shake the baby?

A. No. That's when he put her down and I took her in my hands.

Q. Is this the only time you observed your husband, Steven, shake your daughter, Crystal?

A. No.

Q. What other time did he shake her?

A. Early this morning and last night too. You might as well put it all in there.

Q. Tell me what happened earlier this morning.

A. I got out of bed, and he had her out of bed already. I heard her screaming still, so I got up and asked him what the fuck was going on with my girl. He said he was changing her diaper, and I asked if he's fed her yet. He said, 'No, bitch.' So I went in and fixed her bottle, and she was crying; and that's when he started shaking her the first time. So I brung her the bottle into her and was going to feed her, and he snatched the bottle from me and squirted it all over her face. So I picked her up, took her in the kitchen, and washed her off. Then went downstairs to get my clothes out of the dryer, and then walked into my bedroom to get dressed. And he came in and yanked her out of my arms and said he wanted her. She wanted her dad instead of mom. So I followed them in the front room and him and her sat on the couch. I sat in the chair. She started crying again, so he kind of like tossed her on the floor and told me to leave her the fuck alone because I was the one that made her spoiled, and that's why she always wants mom. And that's when he began to shake her again and told her to fuck'n shut up, fuck'n shut up. We both ran out of cigarettes, and he asked me to go to the gas station. And I came back home, and she was still sitting there screaming. I asked him what happened, and he couldn't tell me. Then I asked him to let me take her to the

baby sitter, and he told me no. So I laid her down and made sure she was asleep, and he said he would take her over to the baby sitter; so I went to work. And about 15 minutes at work a cop came and got me saying my baby was in the hospital.

Q. Has Steven ever struck, shook, or thrown Crystal before this date?

A. Yeah.

Q. Can you tell me about those times?

A. It wasn't as bad as it is now. He'd just like barely shake her and tell her to quiet, to be quiet and then hand her to me. He didn't really get angry with her like he does now.

Q. When Steven grabbed and shook Crystal today, can you describe the way he grabbed and he shook her?

A. He picked her up and grabbed her tight and started shaking the piss right out of her.

Q. Where did he grab her?

A. At the arms.

Q. Did he shake her by holding just her arms?

A. He just took a big grip on her and grabbed her and started shaking her real hard. He was shaking also. That's why I knew, that's why I know he was really angry.

Q. Was Crystal being held by the arms alone when he shook her?

A. He was squeezing so hard her elbows were going into her ribs. She was screaming.

Q. Did you try to get Crystal from his grasp?

A. Yeah.

Q. Did he give her to you?

A. No. He said he'd kick my ass if I tried. When I did try, he hit me.

Q. How did you end up with her?

A. He finally got tired of hearing her scream, so he said, 'Here. Take your spoiled fuck'n brat.'

Q. You stated you fed Crystal?

A. I fed her, burped her, put her down in the bassinet, and patted her until she went to sleep and told him she should sleep an hour. When she wakes up to take her right over to the baby sitter and call me when he got to the baby sitter's. That's when the cops came out and got me."

Three doctors testified concerning the cause of the seven-month-old baby's death. The doctors all considered the baby's prior

injuries as relevant in making their determination as to the cause of death.

Dr. William Hannigan, a neurosurgeon, testified that the baby died from shaking. Dr. Howard Cohen, a pediatrician, testified that the baby suffered from brain swelling and retinal hemorrhages. Dr. Cohen observed on the X rays older rib fractures and left forearm fractures which were in the process of healing. Dr. Cohen said the older injuries clearly established a pattern of abuse known as "shaken baby syndrome." Dr. Cohen observed some bruises on the baby's face. Dr. Cohen said that all of the baby's injuries indicated a pattern of abuse over a long period of time.

The final doctor to testify was Dr. Mary Jumbelic, a forensic pathologist, who performed the autopsy on the child. Dr. Jumbelic observed that the seven-month-old infant was 27½ inches in length and weighed only 12½ pounds. She said the child was markedly underweight. Dr. Jumbelic observed fractures to the left ribs and radius and ulna of the left forearm. She also observed more subtle fractures in the right humerus, distal femur, and proximal tibia. Dr. Jumbelic testified that the fractures in the right shoulder and in both knees were a result of traction and shearing-type forces in the joint and not from a fall or banging the knee against something. Dr. Jumbelic concluded that these fractures were a result of the child being shaken.

The majority states, "Other evidence showed that Crystal had prior injuries which were indicative of a pattern of child abuse. However, none of these prior injuries were caused by shaking." (246 Ill. App. 3d at 180.) Based on my review of Dr. Jumbelic's testimony, I do not agree with the majority's conclusion that none of the victim's prior injuries were caused by shaking. I reach the opposite conclusion.

The testimony of many witnesses established that the defendant was responsible for a burn to the victim's cheek and bruises to her face. The defendant's wife said at the hospital that injuries to the child "happen all the time" when she left the child with the defendant. She also admitted in her statement to the police that the defendant had shaken the child on previous occasions. Based on this evidence, I believe the defendant was responsible for the old fractures, which were shearing bone injuries to the child's shoulder and both knees. I reach this conclusion based on the fact that the evidence showed the defendant had shaken the child on prior occasions and because Dr. Jumbelic established that the injuries were caused by shaking.

The defendant said that he didn't shake the child hard and didn't intend to injure her. The evidence doesn't support his testimony. Why then did he lie to the police and change his story at trial? The only logical conclusion is that the defendant was trying to cover up the murder of the child. The jury reached the same conclusion. Furthermore, the jury was in a far better position than this reviewing court to observe the manner and demeanor of the witnesses, weigh the evidence presented, and judge the credibility of the defendant.

After viewing the evidence in the light most favorable to the prosecution, I believe a rational trier of fact could have found the elements of first degree murder beyond a reasonable doubt. I would affirm the jury's verdict.