THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FRANK L. RADER, Defendant-Appellant.

Fourth District    No. 4—93—0661

Opinion filed May 31, 1995.

Daniel D. Yuhas and Martin J. Ryan, both of State Appellate Defender's Office, of Springfield, for appellant.

C. Stephen Ferguson, State's Attorney, of Charleston (Norbert J. Goetten, Robert J. Biderman, and James Majors, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE KNECHT delivered the opinion of the court:

Defendant Frank L. Rader was convicted of aggravated battery of a child. (Ill. Rev. Stat. 1991, ch. 38, par. 12—4.3.) He was sentenced to 12 years' imprisonment and appeals both his conviction and sentence. We affirm.

In September 1992, defendant was charged with aggravated battery of a child, his son D.R. (born April 20, 1992). At a stipulated bench trial in February 1993, the following facts were presented. Jackie Cooper (Jackie) lived near defendant and his wife Dorothy Rader and their baby, D.R. On September 6, 1992, defendant came to her apartment and stated D.R., his 4 1/2-month-old baby, was dead. The baby was not breathing, and his eyes were rolled up into his head. Defendant stated he had just been playing with the baby. Jackie previously warned defendant several times he was too rough with the baby. The police had also "been involved" after bruises had been observed on the baby. The baby's mother told Jackie she believed defendant was causing bruises. James Cooper (James), Jackie's husband, arrived home and observed defendant bouncing D.R. up and down, but the baby was not breathing, and his eyes were rolled up into his head. James took the baby and attempted to administer mouth-to-mouth resuscitation.

Dr. David Keil, an emergency room physician at the Sarah Bush Lincoln Health Care Center (Sarah Bush) in Mattoon, Illinois, was on duty when D.R. was brought to the hospital by ambulance. D.R. was not breathing, but Dr. Keil revived him. A spinal tap indicated a brain hemorrhage. A severe brain injury was suspected, so the baby was later transferred to St. John's Hospital (St. John's) in Springfield, Illinois. Defendant arrived at the hospital and told Dr. Keil the baby was lying in his crib when all of a sudden the baby began gasping and stopped breathing. He tried to rouse the child and then ran downstairs to a neighbor's apartment to call for help. After speaking with defendant, Dr. Keil reexamined the baby. The baby's severe injury was inconsistent with the defendant's story. Dr. Keil again spoke with defendant. Defendant now stated he had been playing with the baby, holding the baby upside down, with the baby's feet over his head. Defendant claimed the baby suddenly stopped breathing, whereupon he slapped and shook the baby in an attempt to revive him. Dr. Keil concluded, based on his examination and the inconsistent stories by defendant, the baby was a victim of severe child abuse and had been shaken severely. Dr. Keil also overheard defendant and his wife as she accused him of being too rough with the baby.

Dr. Steven R. Bowers, a physician with the Southern Illinois University (SIU) School of Medicine, Department of Pediatrics, is also a pediatric internist at St. John's. He examined D.R. and observed two bruises to the forehead as well as marks on the eyelids of the baby, and jerking seizures. His initial exam indicated the baby had a brain injury. A computerized axial tomography (CAT) scan determined the baby had a subdural hematoma to the interior portion of his brain. This stemmed from an old injury as well as from a new injury. The baby had difficulty breathing, and the baby's brain was so swollen Dr. Bowers could not initially determine the extent of injuries. His prognosis was the baby was paralyzed on the left side, would always suffer from seizures, had widespread brain injury, was possibly deaf and blind, and would be developmentally delayed. Based on his examination, test results, and an examination by an ophthalmologist, Dr. Bower concluded the baby was a victim of child abuse, known as "shaken baby syndrome." The force necessary to cause the injuries was in excess of what a normal person would use. In order to cause D.R.'s injuries, the baby must have been picked up and shaken severely and repetitively. A simple shake of the baby would not have caused the injuries.

Dr. Blas Zelaya, a pediatric neurologist in Springfield, was called in to examine D.R. because neurological and brain damage were suspected. He examined D.R. and found extensive hemorrhaging of the retinas of the eyes. Fluid was present in the anterior portion of D.R.'s brain, causing pressure within the head. It was Dr. Zelaya's prognosis the baby had impaired vision, was probably deaf, had some kind of brain deficiency, probably would be developmentally disabled, and had left side paralysis. It was his opinion D.R.'s brain injury was directly related to a severe shaking. It would require fierce and repetitive shaking for a child to suffer from the severe retinal hemorrhages which he observed in D.R.

Dr. Thomas Fleming is an assistant professor of ophthalmology and an ophthalmologist specializing in retinal repair at the SIU School of Medicine Eye Center in Springfield. He was called in by Dr. Bowers to conduct an eye examination on D.R. He observed a 360-degree diffused hemorrhage on the retina and severe intra-retinal hemorrhaging. The hemorrhaging was massive, and on a scale of 1 to 4, the damage was a 4. The damage was consistent with shaken baby syndrome. To cause the severe hemorrhaging of the retina he observed in D.R., the baby must have been shaken repeatedly over a prolonged period in a violent manner. It was his prognosis the baby was blind, and although the baby's eyesight might improve, he would be legally blind as a result of the injury. Further, for there to be such

severe hemorrhaging of the retina, there must also be severe brain hemorrhage.

Chief Dave O'Dell of the Mattoon police department and Detective Joe Plummer interviewed defendant on September 9, 1992. Defendant gave them the following story: on September 6, 1992, he had been home alone playing with D.R. and lifted his legs over his head about four or five times. One of these times, he noticed liquid coming out of the baby's nose, and D.R. went limp. He vigorously shook D.R. because he thought D.R. was having a seizure. Nothing happened, so he slapped D.R. three or four times on the face. He shook the baby again. He continued shaking and trying to revive the baby for four to six minutes. He then went downstairs to get help, at which time D.R. was not breathing. Defendant admitted to mental and emotional problems and has been admitted to the hospital for psychiatric and emotional care. He suffers from blackouts and loses control of his temper.

After interviewing defendant, Chief O'Dell and Detective Plummer interviewed defendant's wife and then reinterviewed defendant. During this second interview, defendant gave the following story: on September 6, 1992, D.R. appeared fussy. Defendant attempted to cheer up the baby, but D.R. remained fussy. Defendant then picked up the child and shook him. The child laughed while being shook. He continued to hold the baby upside down and continued to shake him. Then, liquid came out of the baby's nose and mouth. Defendant became upset, picked up the child and began shaking the child extremely hard and slapping the child in the face for about five minutes. The baby stopped breathing and defendant went to get help.

Jan Blaney is a caseworker at the Department of Children and Family Services (DCFS). D.R. is currently in a foster home specializing in remedial care of infants diagnosed with shaken baby syndrome. D.R. has regained some of his hearing. He is blind, but on occasion responds to light. He is disabled from severe brain damage and suffers from seizures, which he takes medication to control. The baby will suffer lifelong disabilities as a result of the shaken baby syndrome.

The following stipulated facts were presented for the defense. Barbara Savoroski, a longtime friend of defendant and his family, has known defendant, who was a friend of Savoroski's son, since he was six years old. Defendant lived with her for three to four months in California. During this time, she operated a day-care center out of her home and she saw defendant interact well with the children, whose ages ranged from infants to approximately six to seven years of age. The children liked defendant. She did not observe defendant mistreating or mishandling the children.

Jeanette Rader Colbert is defendant's sister. She has two children, now ages six and seven. She has observed defendant around her children as well as around D.R. Defendant interacted well with the children. She never observed him being mean or mistreating her children. Defendant appeared to be a caring and loving father, and she never saw him mistreating D.R.

Steve Rader is defendant's uncle and resides in California. He is friends with Savoroski. Defendant resided with him for a period of time when defendant was 17. Rader observed defendant interacting with children, namely, defendant's niece and his sister's children, as well as the children in Savoroski's day care. He did not observe defendant mistreating the children. Defendant interacted well with the children and appeared to treat them well. The children appeared to like defendant.

Defendant would testify consistent with the testimony of Chief O'Dell. In addition, at the time of giving the statements to Chief O'Dell, he was under great distress. He believed his statements were consistent, and he was not trying to mislead the police. During the second interview, he was attempting to recall more things that occurred. Further, his actions in regard to D.R. were not intended to cause harm, and certainly not great bodily harm. When he observed there was something wrong with the child, he slapped and shook the child to revive him. He then proceeded to get help. He is remorseful and regretful about the incident, but his actions were not taken with any intent to harm the child.

After this evidence, the court convicted defendant of aggravated battery of a child. At defendant's sentencing hearing in March 1993, evidence was offered both in aggravation and mitigation.

The presentence report revealed defendant has a long history of criminal activity. As a juvenile, he committed retail theft, criminal sexual assault, driving without a valid driver's license, and theft. As an adult, he was convicted of three separate traffic offenses, as well as possession of hypodermic needles and criminal trespass to land. Defendant has been admitted several times to various mental health centers, including once for trying to choke his mother, and "on several occasions for suicidal threats, personal injury to himself, and destructive behavior." Defendant has no assets, current employment, or other monthly income. Defendant has a ninth-grade education. He claims to have a general equivalency diploma, but that was not verified. The presentence report noted defendant had been offered a number of services and programs since his youth, but had chosen not to respond or participate in what was available. No other community resources were available. If defendant was sentenced to probation,

the presentence report concluded defendant's prognosis for successful completion of a term of probation was poor.

The prosecution called several witnesses. Jan Blaney of DCFS read a victim-impact statement. Prior to the assault on D.R., he was a "healthy and happy" baby boy. Now, because of the permanent injuries caused by defendant, D.R. has been placed in foster care, does not see his paternal extended family, and rarely sees his maternal extended family. He struggles to sit up alone and can only see shadows. He will need prolonged speech, physical, and occupational therapy. He may never speak well enough to communicate. He needs medication for his seizures and may never have a seizure-free life. He will need special education and probably his only employment will be in a sheltered workshop for the disabled. He may never have the opportunity to have a family of his own. He will require extensive medical and social service intervention at the expense of taxpayers. Blaney concluded: "It is my hope that the Court will impose a sentence on [defendant] that reflects the traumatic and permanent impact these injuries have had on D.R."

Ann Rader is the natural mother of D.R. and former wife of defendant. She and defendant had considerable difficulty getting along during the marriage. During her marriage to defendant, he lost his temper, became violent with objects and threatened her. He has punched out windows and a door. She obtained an order of protection. She wished to see defendant placed in a correctional center.

Eleanor White is an early interventionist with the Birth Through Two program run by Coles County Industries (CCI). CCI provides services to infants in need. Prior to D.R.'s injuries, DCFS had referred D.R. to CCI for testing. D.R. was tested on August 27, 1992, but was ineligible for services because he was "on target" for a four-month-old baby. Now, D.R. has serious delays in several areas of his development. He sees a neurologist for his seizure disorder. He receives physical and occupational therapy for motor problems. He has been referred to a specialist for his vision and hearing problem. Doctors have proposed treatment to help D.R.'s use of his left side and his limbs. D.R. is not doing things a normal 11-month-old infant should be doing, such as sitting up, rolling over, or crawling. He uses a special chair designed for children with motor problems who cannot sit up by themselves. He requires an increased dosage of seizure medication and will continue to need the medication.

Defendant presented two letters. One letter was from the Edgar County Children's Home. It stated defendant appeared to bond well with D.R., but his parenting skills were limited. On one occasion, defendant was playing roughly with D.R., flipping him upside down and

holding him by his feet. A caseworker warned defendant this was dangerous and could cause permanent damage, but defendant did not seem to understand because D.R. was laughing and liked being upside down. The second letter was from Barbara Savoroski. She stated defendant had been gentle around the children in her care. In addition to the two letters, defendant made a statement in which he reiterated his lack of intent to hurt D.R.

After arguments from counsel, the trial court noted the defendant had a need for psychological treatment, but he had resisted counseling and help. The trial court characterized defendant's immaturity as calculated with a calculated use of physically destructive acts. The trial court also noted the terrible injuries suffered by D.R., the defendant's significant criminal history and the need for deterrence. The trial court sentenced defendant to 12 years' imprisonment. Defendant now appeals his conviction and sentence.

■ Defendant first contends there was insufficient evidence to convict him beyond a reasonable doubt because the State failed to prove he acted with the mental state required for a conviction of aggravated battery of a child. Section 12—4.3(a) of the Criminal Code of 1961 (Code) states:

"Any person of the age 18 years and upwards who intentionally or knowingly, and without legal justification and by any means, causes great bodily harm or permanent disability or disfigurement to any child under the age of 13 years *** commits the offense of aggravated battery of a child." (720 ILCS 5/12—4.3(a) (West 1992).)

The Code defines knowledge as follows:

"A person knows, or acts knowingly or with knowledge of:

(a) The nature or attendant circumstances of his conduct, described by the statute defining the offense, when he is consciously aware that his conduct is of such nature or that such circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that such fact exists.

(b) The result of his conduct, described by the statute defining the offense, when he is consciously aware that such result is practically certain to be caused by his conduct." (720 ILCS 5/4—5 (West 1992).)

Because of its nature, knowledge is ordinarily established by circumstantial evidence, rather than by direct proof. (*People v. Weiss* (1994), 263 Ill. App. 3d 725, 731, 635 N.E.2d 635, 639.) A defendant is presumed to intend the probable consequences of his acts, and great disparity in size and strength between the defendant and the victim, as well as the nature of the injuries, may be considered in this context. (*People v. West* (1990), 137 Ill. 2d 558, 585-86, 560 N.E.2d 594, 606-07.) Defendant asserts the State failed to provide sufficient

circumstantial evidence to prove he acted intentionally or knowingly, and at most his conduct was reckless or negligent.

A criminal conviction will not be set aside unless the evidence is so unsatisfactory it creates a reasonable doubt of the defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276.) When presented with a challenge to the sufficiency of the evidence, a reviewing court will sustain a criminal conviction if " 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) (*Collins,* 106 Ill. 2d at 261, 478 N.E.2d at 277, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) There is more than sufficient evidence in this case to support a finding defendant is guilty of aggravated battery of a child beyond a reasonable doubt.

This case is similar to *People v. Renteria* (1992), 232 Ill. App. 3d 409, 597 N.E.2d 714. In *Renteria,* the defendant was charged with aggravated battery of a 2$\frac{1}{2}$-month-old baby. The baby suffered multiple injuries, including brain and retinal hemorrhaging. The defendant gave inconsistent stories to the police. At a bench trial, a physician testified for the prosecution the injuries to the child were not consistent with defendant's stories and were instead consistent with shaken baby syndrome because of the violent nature of shaking necessary to cause such injuries. Even the defendant's own testifying physician admitted the child's injuries were severe and could have been caused only by severe shaking. The trial court found the defendant guilty, and the defendant appealed. The defendant alleged the State's evidence was insufficient to prove he intended or knew his shaking the child would cause the baby to suffer great bodily harm or permanent disability. The defendant asserted his conduct was at most reckless or negligent.

The appellate court affirmed the defendant's conviction. The court discussed the trial testimony, which had revealed the child's injuries were severe and permanent, were consistent with shaken baby syndrome, could have been caused only by severe and repeated shaking, and were inconsistent with the defendant's version of what happened. The court declared these circumstances surrounding the incident, including the severity of the baby's injuries, could lead a reasonable trier of fact to infer the defendant's conduct was intentional or knowing. The court also noted defendant immediately sought medical help which demonstrated he was aware of the extent of the injuries inflicted on the child.

■ Here, the evidence showed D.R.'s injuries are severe and per-

manent, are consistent with shaken baby syndrome, and could only be caused by severe and repetitive shaking. A rational trier of fact could infer defendant *must have known* of the substantial probability of causing injury to D.R. based on the severity of violence necessary to cause the injuries. In addition, D.R.'s injuries are starkly inconsistent with defendant's conflicting versions of what happened. A rational trier of fact could believe defendant was attempting to hide the truth from police because he knew his actions were dangerous to a baby. Defendant is an adult male who stands 5 feet 11 inches tall and weighs 200 pounds, whereas D.R. was a 4$^1$/$_2$-month-old baby at the time of the incident. A rational trier of fact could find defendant must have been aware *any* violent shaking by him of a tiny infant would have the substantial probability of causing great bodily harm. Finally, defendant immediately sought medical attention for D.R., which demonstrated his conscious awareness of the severity of D.R.'s injuries. All this evidence was sufficient for a rational trier of fact to find, beyond a reasonable doubt, defendant acted intentionally or knowingly in causing great bodily harm to D.R.

Defendant relies on *People v. Holmes* (1993), 246 Ill. App. 3d 179, 616 N.E.2d 1000. In *Holmes*, a divided panel of the appellate court overturned the defendant's conviction for murder based on the death of his seven-month-old baby caused by shaken baby syndrome. The majority concluded the evidence was insufficient to find defendant acted knowingly because he had only a seventh-grade education, the death was caused by a one-time shaking, the defendant testified he did not know shaking the baby could kill him, and no evidence was introduced by the State which showed defendant *knew* his actions could cause death or great bodily harm to the baby.

The dissent cited the uncontroverted evidence at trial by several physicians which demonstrated the baby's death was caused by *severe* and *repetitive* shaking known as shaken baby syndrome, the injuries occurred over a period of time, and the injuries were inconsistent with the defendant's version of what happened. The trial testimony showed defendant gave false and inconsistent stories to paramedics, the police, and the jury. In addition, the defendant's wife testified he had shaken the baby on prior occasions. The dissent concluded this was sufficient circumstantial evidence for a rational trier of fact to find, beyond a reasonable doubt, the defendant acted knowingly. *Holmes*, 246 Ill. App. 3d at 186-87, 616 N.E.2d at 1005 (McCuskey, J., dissenting).

We need not decide whether *Holmes* can be factually distinguished. We simply disagree with the focus of the *Holmes* majority, and agree instead with the analysis by the dissent, as well as with

the court's analysis in *Renteria*. Not only can circumstantial evidence be used to prove knowledge, but absent evidence of an admission by a defendant, it is the only way to prove knowledge. The majority in *Holmes* failed to note knowledge is usually proved by circumstantial evidence, and failed to consider the circumstantial evidence shown by the prosecution and discussed by the dissent. A defendant need not admit knowledge for the trier of fact to conclude a defendant has knowledge. (See, *e.g.*, *People v. Williams* (1995), 165 Ill. 2d 51, 64 (noting mental state of defendant in child abuse case can be inferred from violent nature of defendant's conduct).) Applying the proper focus on circumstantial evidence in the case at hand, the evidence was sufficient for a rational trier of fact to find, beyond a reasonable doubt, defendant acted knowingly. The trial court's finding defendant guilty beyond a reasonable doubt is affirmed.

■ Defendant next asserts his sentence should be reduced because the trial court improperly weighed the factors in mitigation and aggravation. The trial court should impose a sentence based on the evidence at trial, the presentence report, the financial impact of incarceration, evidence in aggravation and mitigation, arguments as to sentencing alternatives, any statement by the defendant, and a victim-impact statement. (730 ILCS 5/5—4—1(a) (West 1992).) In imposing a sentence for a violent crime, when such offense results in the personal injury of someone other than the defendant, the trial judge shall specify on the record the particular evidence, information, factors in mitigation and aggravation, or other reasons that led to his sentencing determination. (730 ILCS 5/5—4—1(c) (West 1992).) The permissible range of incarceration for conviction of aggravated battery to a child is between 5 and 30 years. (720 ILCS 5/12—4.3(a) (West 1992).) The imposition of sentence is a matter of judicial discretion, and the trial court's sentence will not be disturbed absent an abuse of that discretion. *People v. Jones* (1994), 265 Ill. App. 3d 627, 639, 637 N.E.2d 601, 610.

Defendant asserts the trial court failed to consider two mitigating factors: he did not contemplate his criminal conduct would cause or threaten serious physical harm to another, and there were substantial grounds tending to excuse or justify his criminal conduct, though failing to establish a defense. (730 ILCS 5/5—5—3.1(a)(2), (a)(4) (West 1992).) These arguments are without merit.

Defendant's assertion he did not contemplate his criminal conduct would cause or threaten serious physical harm to D.R. is at odds with his conviction for *intentionally* or *knowingly* causing great bodily harm to D.R. Defendant's conviction was necessarily based on the fact he *was* aware of the substantial possibility of harm to D.R.

Defendant cannot relitigate his guilt during sentencing. The trial court did not err in failing to consider this as a mitigating factor.

Defendant next asserts his conduct was justified or excused because he shook D.R. in the mistaken belief he could revive D.R. This argument again presupposes defendant's explanation for D.R.'s injuries is truthful. The trial court chose to believe the testimony of the physicians at trial who stated D.R.'s injuries were not consistent with defendant's explanation. The trial court could have chosen to believe the testimony of several physicians over the testimony of defendant and therefore did not err in failing to consider defendant's alleged excuse as a mitigating factor.

Defendant additionally asserts the trial court failed to consider the statutory mitigating factor he had no history of felony convictions. This argument is without merit. Section 5—5—3.1 of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5—5—3.1 (West 1992)), cited by defendant, has no such provision. The Unified Code states a mitigating factor exists only if the defendant has "*no* history" of recent criminal activity (emphasis added). (730 ILCS 5/5—5—3.1(a)(7) (West 1992).) Defendant has a long and recent history of criminal activity.

Defendant also puts forth a laundry list of excuses: (1) as a child, he was sexually abused, never knew his father, had to move a lot, and was bounced around between family members; (2) his only child is D.R.; (3) he was not experienced as a parent; (4) he now is remorseful and regretful over the incident and (5) he would like to take college courses and vocational classes to improve himself during incarceration so that he would make a better father. Assuming these are accurate descriptions, they are more than counterbalanced by the statutory aggravating factors present.

Defendant next attacks the aggravating factors relied upon by the trial court. Defendant first asserts the only factor properly considered in aggravation would be his history of prior delinquency or criminal activity. (730 ILCS 5/5—5—3.2(a)(3) (West 1992).) He contends his criminal history should not have been given much weight because he had no prior history or criminal convictions for violent offenses other than a juvenile offense. This argument ignores an important implication in defendant's criminal history: he is unwilling to learn from his mistakes or to respect laws enacted for the protection of the public's safety. The trial court was entitled to take this factor into consideration.

Defendant next asserts the trial court improperly considered the need to deter similar conduct in the future. Defendant argues because he did not intend to injure D.R., a lengthy term of imprisonment is

inappropriate because it will not deter similar conduct by himself or others in the future. Once again, defendant's argument is premised on an acceptance of his version of the events surrounding D.R.'s injuries. The trial court found defendant acted either intentionally or knowingly in harming D.R. Therefore, a lengthy term of imprisonment for defendant's conduct may deter similar conduct by him or others who otherwise would engage in conduct they either intend or know will cause severe injuries to an infant.

Defendant finally asserts the trial court improperly considered the degree of harm to D.R. as an aggravating factor. Defendant cites *People v. Saldivar* (1986), 113 Ill. 2d 256, 497 N.E.2d 1138, for the proposition a factor implicit in an offense generally should not be used as an aggravating factor at sentencing. This proposition is true but defendant ignores the further holding of *Saldivar* which declared the trial court may consider the nature and circumstances of the offense, including the nature and extent of each element of the offense as committed by the defendant, in sentencing a defendant:

> "The legislature clearly and unequivocally intended that this varying quantum of harm may constitute an aggravating factor. While the classification of a crime determines the sentencing range, the severity of the sentence depends upon the *degree of harm* caused to the victim and as such may be considered as an aggravating factor in determining the exact length of a particular sentence, *even in cases where serious bodily harm is arguably implicit in the offense for which a defendant is convicted.*" (Emphasis in original.) *Saldivar*, 113 Ill. 2d at 269, 497 N.E.2d at 1143.

D.R. has severe and permanent injuries and disabilities. These injuries and disabilities include legal blindness, substantial hearing impairment, partial paralysis of his left side, and brain damage resulting in severe developmental disabilities and seizures. These injuries far exceed the level of harm necessary to meet the "great bodily harm or permanent disability" element of aggravated child battery. (720 ILCS 5/12—4.3(a) (West 1992).) The trial court properly considered the extent of D.R.'s injuries as an aggravating factor.

There are significant aggravating factors in this case. The trial court did not abuse its discretion in sentencing defendant to only 12 out of a possible 30 years' imprisonment. Given the extent of D.R.'s injuries, defendant should feel fortunate his sentence is not longer.

The judgment of the trial court is affirmed in its entirety.

Affirmed.

COOK and STEIGMANN, JJ., concur.