2021 IL App (1st) 190870-U

FOURTH DIVISION
May 6, 2021

No. 1-19-0870

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17 CR 2462 |
| DANIEL BRYANT, | ) ) | |
| Defendant-Appellant. | ) ) | |
| | ) ) ) | Honorable Joseph Michael Cataldo, Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Affirming the judgment of the circuit court of Cook County where the evidence was sufficient to support the defendant's conviction of aggravated battery of a child.

¶ 2     Following a bench trial, defendant Daniel Bryant was convicted of aggravated battery for the injuries which he inflicted on seven-month-old Serenity and was sentenced to 12 years in prison.  On appeal, defendant claims that the State's evidence was insufficient to find him guilty

beyond a reasonable doubt of aggravated battery of a child.  For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4      Defendant was indicted on February 8, 2017, on three counts of battery:  aggravated battery of a child (720 ILCS 5/12-3.05(b)(1) (West 2016)) (class X felony); aggravated battery of a child (720 ILCS 5/12-3.05(b)(2) (West 2016)) (class 3 felony); and aggravated domestic battery (720 ILCS 5/12-3.3(a)) (West 2016)) (class 2 felony).  Based on all three counts, defendant allegedly injured Serenity on January 12, 2017, causing trauma to her head.

¶ 5      Defendant waived his right to a jury trial and the case proceeded to a bench trial where the following testimony was presented.  As defendant raises issues regarding the sufficiency of the evidence on appeal, we recount the testimony in detail.

¶ 6                                 Mother's Testimony

¶ 7      Julie Creamer (Julie), Serenity's mother, testified that she is the mother to fraternal twins Serenity and Caleb and defendant is not their biological father.  In 2016, she commenced a relationship with defendant when she was three months pregnant.  When the twins were born in May 2016, she had an emergency cesarean section at 36 weeks due to a placental rupture.  While the twins were born healthy, they were small for their birth weight, so they remained at the hospital for two weeks.  Thereafter, Julie was able to take the babies home where she resided with her mother (Caroline Braband) and defendant.

¶ 8      On January 12, 2017, Serenity was a healthy seven-month-old baby.  As a two-month-old Serenity had been diagnosed with acid reflux.  That medical condition, however, had been resolved.  At 3:30 p.m. that day, Julie went out to run some errands with a friend leaving the twins in defendant's care.  Before she left, she fed and changed Serenity and played with both of

her twins. She did not notice any unusual behavior from Serenity.

¶ 9    At 4:45 p.m. she received a phone call from her mother informing her that Serenity was listless and had shallow breathing. Her mother requested she return home. Julie asked her mother to call 911 if Serenity's condition worsened. Shortly thereafter, her mother called again and informed Julie that she had called 911 and requested Julie meet her at the hospital.

¶ 10    On cross-examination, Julie testified that Serenity had been fussy the night before and had experienced a "small fever" a couple of days prior. Julie also testified that when the twins were three or four months old, she left them in her vehicle while she went inside a Wal-Mart to use the restroom. As a result, she became involved with the Department of Children and Family Services. She, however, was never criminally charged and her children were permitted to remain in her custody.

¶ 11    Julie further testified that defendant acted like a surrogate father to Serenity and Caleb. She trusted defendant with her children and left them in his care regularly at least two or three times a week. In addition, defendant walked with a cane due to a prior injury and Julie had observed him fall before. In the time she has known defendant she never observed him "get physical" with anyone, although she did admit that defendant had a drinking problem and he had lost his temper in her presence.

¶ 12                          Grandmother's Testimony

¶ 13    Caroline Braband (Caroline), Julie's mother, testified that on January 12, 2017, her daughter, Caleb, Serenity, and defendant were living with her. She observed Serenity at 3:30 a.m. before she went to work. Serenity was whimpering so Caroline changed her diaper. According to Caroline, Serenity was acting normal and was happy once she was changed. She returned from work after 4:30 p.m. When she entered her residence, it was quiet. She called out,

" 'Is anyone there? Is anyone there?' " and then defendant came out from the master bedroom "frantic" and said he needed help with Serenity. Serenity was on the queen size bed laying on a pillow. She was listless, had shortness of breath, and "didn't look very good." Defendant was suctioning phlegm from Serenity's mouth with a bulb syringe. She first called Julie and then called 911 at 4:40 p.m. She informed the 911 operator that Serenity was listless, had labored breathing, could not open her eyes, and that she was "like a limp flower." Meanwhile, defendant was "just sitting and watching [Caroline]." Serenity was then transported to the hospital and Caroline followed. Defendant stayed behind to look after Caleb.

¶ 14                                    First Responder Testimony

¶ 15    Richard Anderson, a firefighter/paramedic employed by the Village of Hoffman Estates testified that on January 12, 2017, at 4:40 p.m. he was dispatched to an apartment on the 1300 block of Rebecca Drive in Hoffman Estates, Illinois. When he arrived, two seven-month-old infants were present along with their grandmother and defendant. The male infant was in a crib and the female infant, Serenity, was lying on the bed. Serenity appeared lethargic. The "family" further indicated that Serenity currently was not sick. Serenity had normal vital signs and was transported to St. Alexius Medical Center (St. Alexius) via ambulance. He then transferred Serenity to the care of a nurse at the St. Alexius emergency room.

¶ 16                                       Detective Testimony

¶ 17    Detective Alex Fairall of the Hoffman Estates Police Department testified that he and his partner Detective Brian Zaba investigated Serenity's injuries. He had initially received a 911 call from the hospital that a seven-month-old female was being treated in the emergency room for a brain bleed possibly due to trauma. He also learned that Serenity had a sibling who was still at the residence. Detectives Fairall and Zaba went to the residence and observed defendant

and Caleb along with two other police officers. The detectives spoke with defendant who informed them that he had been alone watching the babies and found Serenity unresponsive and not breathing. Defendant, however, at the same time informed the officers that Serenity was also coughing up phlegm. Defendant said he could not call 911 because he did not have a telephone and did not want to leave the children alone to search for one.

¶ 18 Detectives Fairall and Zaba transported defendant to the Hoffman Estates Police Department where defendant waived his *Miranda* rights and was interviewed. The initial interview lasted 35 minutes and defendant informed them that "he had slipped and fallen on top of the victim" as "his leg had given out." This occurred while he was standing on the hardwood floor. The interview then ended, and defendant was provided a meal. Later that evening, a second interview with defendant commenced where he informed them "he had dropped the victim to the floor, she hit the hardwood, and that his head had made contact with her head." The interview concluded and defendant was kept overnight at the police department. The following day, the defendant's interview continued at 11:45 a.m. for 20 minutes. During the interview, defendant was provided with his prescription medication, Fluoxetine. Defendant told the detectives that without this medication "he gets angry." Regarding Serenity, defendant informed the detectives that "he had dropped her onto the hardwood floor, and that she stopped breathing, and that he picked her up and swung her back and forth" four times. Defendant demonstrated how he swung Serenity which the trial court described as, "he's [Detective Fairall] standing up with his arms in front of him, palms facing up, rotating back and forth." Defendant further informed them that Serenity was not breathing after he swung her, and he dropped her into her crib "[o]nto her head." The interview concluded and defendant was provided lunch.

¶ 19 At 4 p.m. on January 13, 2017, defendant was brought back for his final 15-minute

interview. Detective Fairall and an assistant state's attorney were present at this interview. Defendant was again advised of his *Miranda* rights, which he waived and agreed to speak to them. Defendant explained that "he had dropped [Serenity] onto her head on the hardwood floor next to the crib, and then, again, said that he dropped her into the crib onto her head, and again, demonstrated how he swung her back and forth."

¶ 20     Detective Fairall further testified that these interviews with defendant were recorded and that the DVD of these interviews were true and accurate depictions of what occurred on January 12 and 13. The DVD was admitted into evidence and published to the court.

¶ 21     Defendant's explanation of how Serenity came to be injured changed over the course of each interview with the detectives. In his first interview, defendant explained that when Julie left Serenity was in her crib and was doing fine. He then came back 10 or 20 minutes later and found she was not breathing. However, he later stated that he placed Serenity in her crib as she was colicky and fussing. After being asked to provide additional details, defendant broke down and started crying stating he tripped and fell while holding Serenity and then fell on top of her. This occurred in the living room while he was standing on the hardwood floor. She had already been crying; however, after she fell, she commenced crying even harder. He then placed her in her crib, and then she was "totally fine."

¶ 22     In his second interview defendant acknowledged that when Julie left the children, they were "fine and dandy" and "happy, joyous and free." He was carrying Serenity in the living room when he tripped and fell on the hardwood floor. Serenity fell out of his hands and he fell on top of her. His forehead also hit her forehead. Defendant also acknowledged that Serenity was fussy "pretty much" the entire time he was with her and he could not soothe her. Thereafter, instead of stating he tripped on something, he stated he "slipped on something" which he

identified as a baby's play gym. He got up to place her in the crib when he slipped and fell on top of her then he dropped her. He placed her in the crib, and she was "perfectly fine" and breathing. But she was also crying. He left the room and went to watch television with Caleb. Serenity continued crying for 30 minutes to an hour. When she stopped crying, he went back to check on her to see if he had "hurt her in any way." When he came back into the bedroom, she had a blanket over her head.

¶ 23    The third interview was conducted the following day at 11:45 a.m. Defendant again stated he slipped and fell on top of Serenity with his head hitting her head. This time, however, he stated that Serenity was not breathing so he picked her up and put her in the crib. She "kind of" began breathing so he picked her up and put her on the bed to attempt CPR until Caroline walked in. Defendant admitted he lied when he said he left her in the crib for 30-60 minutes. Defendant also explained that Serenity was being fussy and that she "could have been teething or something." When the detectives informed defendant that Serenity had a brain hemorrhage and needed emergency surgery, defendant broke down but insisted he did not shake her. He stated he rocked her back and forth four times in his arms while twisting his body "like a jolt." He did not use all his strength but swung her "pretty hard." Later in the interview, defendant admitted he dropped Serenity from a height of approximately two feet into her crib. He denied dropping her on the floor.

¶ 24    After the detectives had exited the interview room, defendant is observed on the video talking to himself and stating, "Good Lord please help Serenity be alright. I didn't mean to drop or shake her. It was an accident … I just didn't know what to do. I was panicking."

¶ 25    The assistant state's attorney was present with the detectives during the fourth interview, which occurred later that afternoon and lasted 10 minutes. Defendant admitted, "Serenity was

crying and I didn't know how to handle it and whatnot. So I did something stupid that I didn't want to do. I'm, I'm sorry for doing it." After being told Serenity was in the pediatric ICU with severe brain injuries, defendant admitted, "I dropped her next to the crib. Then I picked her up and put her in the crib and I dropped her that way. Then I tried to resuscitate her ***." He denied dropping her out of anger or on purpose.

¶ 26                                    Medical Testimony

¶ 27    Dr. Konstantin Denev (Dr. Denev), a board-certified physician in pediatrics and pediatric intensive care who practices at St. Alexius, testified as an expert in the field of pediatric intensive care without objection. Dr. Denev testified he has treated 5,000 pediatric patients for a variety of injuries and at least 100 of those children suffered from subdural hemorrhages.

¶ 28    Dr. Denev testified as follows. On January 12, 2017, at 5:13 p.m. he treated Serenity in the emergency room of St. Alexius. Serenity presented with difficulty breathing and was lethargic. He was aware that Serenity had a twin and that they were born at 36 weeks and that they spent two weeks in the neonatal ICU but had no other significant medical history. She also had no documented fever or symptoms prior to coming to being admitted to the emergency room. When he initially examined Serenity, she had already been intubated. The emergency room physician, Dr. Dina Hoover, informed him that Serenity had developed "gasping and agonal respirations" as well as "posturing and seizures." Dr. Denev explained that "posturing" consists of abdominal movements that "may represent seizures" that happens with some injury to the brain.

¶ 29    Dr. Denev performed a physical examination of Serenity's entire body and he did not observe any external bruising or injuries. Dr. Denev ordered a CAT scan of Serenity's head due to the acute seizures. Dr. Denev explained that "acute seizures" occur in a patient that has never

had a seizure before and is thus not suffering from a chronic seizure disorder. The CAT scan revealed a right subdural hemorrhage and a small left parenchymal (bleeding inside the brain matter). Dr. Denev explained that on a CAT scan, an acute hematoma appears white because the blood is in high density layers on the surface of the brain. After 72 hours, the color of the hematoma on the CAT scan changes from high density to low density and would appear more "grayish." If it is a rebleed of a prior hematoma, then it would appear both white and gray. Serenity's hematoma appeared white on the CAT scan. An MRI was also taken, which demonstrated no issues with Serenity's veins that could have caused the subdural hematoma.

¶ 30    According to Dr. Denev, the most common cause of a subdural hemorrhage in pediatrics is a head injury. For a subdural hemorrhage to occur, there must be moderate to significant force to the head. Symptoms which may be found after a subdural hemorrhage can be fussiness, irritability, lethargy, vomiting, and seizures. Based on Serenity's CAT scan and history, her injury was acute, meaning it happened within the last several hours.

¶ 31    A neurosurgeon, Dr. Bryan Bertoglio, placed a device inside Serenity's head to monitor the pressure. Dr. Bertoglio diagnosed Serenity as having "closed head trauma subdural hemorrhage." Dr. Denev testified that "closed head trauma" is an injury without "communication with the outside" as opposed to an open head injury when there is a laceration of the scalp and an open fracture to the skull. In a separate surgery, Dr. Bertoglio placed a drain to remove the fluid from Serenity's head and then two weeks later he placed a shunt in her head to drain the fluids to the abdomen.

¶ 32    On January 13, 2017, Serenity was examined by an ophthalmologist, Dr. Kimberlee Curnyn, who diagnosed Serenity with bilateral retinal hemorrhages. Dr. Denev testified he has treated between 50 and 100 pediatric patients who have had retinal hemorrhages and that such an

injury is most likely caused by "non-accidental trauma that we used to call[] shaken baby." Dr. Denev opined that moderate to significant force is needed to cause a retinal hemorrhage. Dr. Denev testified that, in his opinion, the clinical presentation of retinal hemorrhages along with the acute onset of seizures, ineffective gasping respirations, and subdural hemorrhage led to his diagnosis that Serenity had "shaken baby syndrome." Dr. Denev testified that shaken baby syndrome and non-accidental trauma diagnoses "overlap" with non-accidental trauma being the "more broad term" and shaken baby syndrome being a subset of non-accidental trauma. Non-accidental trauma means that the trauma is inflicted upon the child intentionally.

¶ 33    When asked, in his expert opinion, what he believed the cause of Serenity's injuries was, Dr. Denev explained, "With the shaken babies acceleration and deceleration injury, when the baby's head moves back and forth and the brain hits the back of the skull and the front, and there's a shearing force that causes damage to the brain and bleeding." In Serenity's case, her particular injuries would not be caused by a fall into a crib. Nor would they be present as a result of a fall onto the floor as described by defendant. They would also not be present if she were to be swung back and forth four times. Dr. Denev clarified that "a fall will explain the subdural hemorrhage but will not [explain] the retinal hemorrhages." This is because "subdural hemorrhages can occur during shaken baby, which is very common in this age group, less than six months, but subdural hemorrhage can happen during a fall or any kind of head injury." But retinal hemorrhages are well known to be present in shaken baby cases because the acceleration forces from being shaken back and forth can cause the capillaries and small blood vessels in the retina to rupture and bleed. Dr. Denev explained that "the combination of both, the subdural hemorrhage, which is typical for a shaken baby, and the retinal hemorrhages together makes falls much less likely than a shaken baby." According to Dr. Denev, if the subdural hemorrhage were

caused by a fall there would be evidence of some external injury like bruising or marks on the skin which he did not observe on Serenity. He has never observed a retinal hemorrhage from an infant less than one year old caused by a fall onto the floor.

¶ 34    Regarding Serenity's lack of any neck injury, Dr. Denev testified this did not change his diagnosis that she suffered from a non-accidental trauma. Dr. Denev explained that cervical or neck trauma in pediatric patients is rare. In most cases of shaken baby syndrome, there are no neck injuries, thus, "the absence of neck injury does not exclude the possibility of shaken baby." Dr. Denev testified he has never observed a neck injury in a patient under one year old but could not say that it could never happen.

¶ 35    Regarding the impact of these injuries on Serenity, Dr. Denev testified that she has global neurological developmental delay, seizures, and a ventriculoperitoneal shunt. Dr. Denev further testified that this injury has already affected her ability to function on a daily basis. She will need constant care for all her needs.

¶ 36    On cross-examination, Dr. Denev testified that he has observed subdural hematoma caused by an accident and that retinal hemorrhages can be due to other causes, but that is usually found in adults and "much less likely in kids, but it's possible."

¶ 37    When asked whether intracranial pressure can cause retinal hemorrhages Dr. Denev responded, "No. It can cause swelling of the optic disk, the optic nerve, but does not cause inter—retinal hemorrhages." Dr. Denev opined that it would be "extremely unlikely" for Serenity to have sustained retinal hemorrhages as a result of the intracranial pressure.

¶ 38    As to the timing of the injury, Dr. Denev testified that symptoms of an acute subdural hematoma can appear instantly, or they can appear over a course of hours or "even over the course of days." In this case, it is possible that Serenity could have had the acute subdural

hematoma 24 to 48 hours prior to her presentation due to the fact the blood appeared white on the CT scan.

¶ 39    Dr. Denev explained that to cause injuries like Serenity's (retinal hemorrhages and a subdural hematoma), experimental studies have shown that they are caused by moderate to severe trauma with the same force akin to what would cause an adult whiplash in an automobile accident. There are no cases described where rocking movements or tossing the baby in the air and catching the baby have caused similar injuries.

¶ 40    Dr. Denev acknowledged that, based on Dr. Bertoglio's surgical note there was a "possibility that [Serenity] had a pre-existing condition, a benign enlargement of the sub-arachnoid spaces." And that if she had benign external hydrocephalus (BEH), it "increases the risk of the subdural hemorrhage" but that does not explain the cause of the bilateral retinal hemorrhages.

¶ 41    On redirect, Dr. Denev testified that in his experience as a pediatric intensive care physician, intracranial pressure does not lead to a subdural hematoma. Instead, it is the subdural hematoma that causes the increase in intracranial pressure. In addition, in his experience intracranial pressure does not cause retinal hemorrhaging. Lastly, Dr. Denev testified he relied on scientific literature and his practical experience when diagnosing Serenity with shaken baby syndrome.

¶ 42                            Defendant's Case-in-Chief

¶ 43    The State rested its case and defendant moved for a directed finding, which was denied. The defense then called Dr. Steven Barry Abern, a board-certified physician in pediatrics and neurology. Prior to his retirement as a physician, Dr. Abern practiced as a general pediatric neurologist treating children with various neurologic problems such as tumors, ADHD, and

seizures. With no objection, Dr. Abern was admitted as an expert in pediatrics and pediatric neurology.

¶ 44    Dr. Abern testified that his opinions were based on a review of Serenity's medical records and not on any physical examination of Serenity or review of police reports or defendant's videotaped interviews. Serenity was born at 36 weeks and was the "discordant" twin, meaning she was smaller than her brother, Caleb. According to Dr. Abern, there is nothing about her birth or being a premature, discordant twin that would make her more prone to any type of injury, but it could make her at risk for developmental delay.

¶ 45    Regarding her medical records, Dr. Abern noted that Serenity was treated for acid reflux, which was a common diagnosis for an infant. Dr. Abern also noted that there were significant increases in her head circumference month-to-month. Dr. Abern explained that Serenity's rapid head growth was concerning and indicated that there "may" be "something in the intracranial vault that is causing the head to expand."

¶ 46    Dr. Abern also reviewed Serenity's St. Alexius medical records, which indicated she had a subdural hematoma on "the left side." While her medical records indicated it was due to abusive head trauma from shaken baby syndrome, Dr. Abern testified that abusive head trauma is just one of the things that can cause a subdural hematoma. Dr. Abern further testified that "shaken baby" is no longer a term that is used in the medical community because "you cannot shake a baby to achieve subdurals unless you have impact with it ***." According to Dr. Abern, shaken baby syndrome has not been replicated experimentally and has not been found using crash dummies.

¶ 47    Subdural hematomas can manifest symptoms such as fussiness, poor eating, vomiting, lethargy, and seizures. Upon reviewing Serenity's records, Dr. Abern observed that Serenity was

not feeding well, not acting "the same," and was developmentally different from her twin, all which were symptoms consistent with a subdural hematoma. According to Dr. Abern, it could take days for an infant Serenity's age to start presenting symptoms of a subdural hemorrhage or she could never have any symptoms. The subdural hemorrhage would have to be "massive" to present symptomatology within 45 minutes.

¶ 48   Dr. Abern observed that Dr. Bertoglio performed three surgeries on Serenity. In the first surgery, Dr. Bertoglio inserted the intracranial pressure monitor on her right side. During the second surgery, Dr. Bertoglio removed the intracranial pressure monitor and inserted a drain. During this second surgery, Dr. Bertoglio noticed that "the space [between the skull and the brain] looked wider than it normally does and the fluid that he got out of there was clear." Clear fluid could "probably" be a hydroma, which is excess fluid in an area. Dr. Abern testified he believed Serenity had a hydroma and that hydromas can "look exactly like a subdural [hematoma] on a CT or MRI." The fact the fluid that was drained from her brain was clear was notable because an acute subdural hematoma should be blood red or, if it is an old subdural hematoma, it should look like "Crane case oil." Dr. Abern did admit, however, that subsequent laboratory analysis of that fluid indicated that it "was a little bit blood tinged."

¶ 49   Dr. Abern discussed BEH which is increased head circumference associated with an increase in volume of the space between the skull and the brain. A child with BEH "is more susceptible to obtaining a subdural [hematoma] from minor trauma from any trauma, accidental or non-accidental." This is as a result of the bridging veins which go through the space are stretched, and a trauma could cause the vein to break. Dr. Abern opined that a vein could break "just by putting the child down in the crib." Something as small as a cough or sneeze could cause a bleed as well as vomiting or "everyday activities." It is also possible that a child could

have BEH and never have a subdural hemorrhage. If a child has BEH there is no way to determine the cause of a brain bleed.

¶ 50    According to Dr. Abern, the indicators that Serenity could have had BEH were, "[t]he way that she was acting and what we saw on the CT scans." In this case, there was no way to determine how Serenity's subdural hematoma was caused unless one was present for the injury. It could take days for a child Serenity's age to exhibit symptoms of a subdural hematoma, and, in fact, such a child might never present symptoms. If symptoms manifested within 45 minutes of the injury, Dr. Abern testified that the hemorrhage would have to be "massive."

¶ 51    Dr. Abern also testified regarding retinal hemorrhages. Contrary to Dr. Denev's medical opinion, Dr. Abern testified, "[t]he retinal hemorrhage is a consequence of the intracranial pressure or blood in the central nervous system" and a subdural hematoma can cause retinal hemorrhaging. There is no way to tell by retinal hemorrhaging whether a subdural hematoma is abusive or non-abusive.

¶ 52    When asked what type of force was necessary to produce Serenity's injuries, Dr. Abern testified it was a "[f]orce experimentally [*sic*] more than an adult could produce." Shaking alone is insufficient but shaking plus impact "is different" and there was no impact injury here that Dr. Abern noticed in the medical records. Dr. Abern further testified that there is nothing about the flexibility of an infant's neck that would prevent an infant from suffering neck injuries in an abusive situation.

¶ 53    When asked to opine on the cause of Serenity's injuries, Dr. Abern responded, "The diagnosis was subdural hematoma, but I can't tell you how. It could be abusive. It could be non-abusive with BEH. There is no way of telling medically."

¶ 54    On cross-examination, Dr. Abern testified that he did not review the police reports, Julie

or Caroline's statements, or defendant's recorded police interviews. He also did not speak to any of the physicians involved in Serenity's treatment, nor did he examine Serenity. He was also unaware of any of the statements defendant made regarding falling on or dropping Serenity.

¶ 55    Dr. Abern further acknowledged that the clear fluid was removed from Serenity's brain after the second procedure performed by Dr. Bertoglio. During the first procedure, Dr. Bertoglio treated the acute subdural hematoma. He further testified in his opinion a seven-month-old baby who has been violently shaken could not suffer a subdural hematoma and bilateral retinal hemorrhaging from shaking alone—there must be shaking plus an impact. If, however, Serenity had BEH, and she were violently shaken then she would suffer a subdural hematoma.

¶ 56    On redirect, Dr. Abern clarified that if Serenity had BEH, "any shaking can potentially cause a subdural" hematoma. Dr. Abern further testified that if Serenity were violently shaken you may or may not observe other external injuries, "but I would expect to see possibly some bruising because if you were holding the child very tight, you may see some marks on the arms" or rib fractures.

¶ 57                              Trial Court Ruling

¶ 58    After hearing the closing arguments of counsel, the trial court found defendant guilty on all three counts. In rendering its ruling, the trial court found that both Caroline and Julie testified Serenity was in good condition when she was left in defendant's care. Serenity thereafter commenced developing symptoms. Defendant was then taken to the police station where the recordings of his interviews demonstrated "the classic shifting sands of the guilty minds [*sic*] of the defendant where he minimizes his activities, his actions the best he can each and every interview." The court further found that "with each [interview] a little bit more of the truth seems to come out." The trial court noted that when Detective Fairall arrived at the apartment,

defendant stated he was home alone watching the children and found Serenity unresponsive. Then in the first interview at the police station defendant stated Serenity just stopped breathing and denied being rough with her or dropping her. Later in that interview, however, defendant stated he tripped and fell on Serenity in the living room and, after putting her down, discovered she was not breathing. In the second interview, he stated he dropped her in the living room, but that he fell on top of her and hit her head with his head—but he could not recall whether he dropped her before or after changing her. He again denied shaking her. In the third interview, he said he slipped, dropped, and fell on top of Serenity. Then she stopped breathing. He admitted that he lied about putting her to bed for 30 minutes. It was also in this interview that he said "if you call it shaking, I swung her back and forth. I did that. I did it pretty hard, then I dropped her in the bed by accident." In the final interview, defendant admitted to dropping her in the bed and that he "did shake her back and forth, dropped her next to the crib and in the crib." The trial court observed that defendant's story goes "from just discovering the situation, falling, the dropping, the swinging, the swinging pretty hard."

¶ 59    Regarding the testimony of the physicians, the trial court found Dr. Denev's testimony credible and Dr. Abern's testimony to be incredible. Regarding Dr. Abern, the trial court expressly found he was "a little bit eccentric" and that his testimony consisted of "a lot of probabilities." The trial court stated Dr. Denev's final diagnosis of shaken baby syndrome, non-accidental trauma was based on Serenity's presentation at the emergency room, the subdural hematoma, and the bilateral retinal hemorrhages. The trial court found these injuries could not have been caused by a fall. It concluded that Serenity's injuries were caused by defendant shaking her back and forth. The trial court went on to state, "But even in this case, if there was BEH and there is BEH, you have a defendant who admits to swinging the baby pretty hard and

take your victim as you find them." Thus, even if Serenity had "some pre-existing condition that sped those injuries up, it does not change the fact that he did, in fact, do this." The circuit court concluded that there was great bodily harm pointing to the subdural hematoma, seizures, vomiting, global neurological delay, motor delay, the shunt in her head, and her need for assistance for life. The trial court thus found Dr. Denev's testimony more persuasive and credible than Dr. Abern.

¶ 60                                    Sentencing

¶ 61    The matter proceeded to a sentencing hearing. After listening to arguments in aggravation and mitigation, as well as considering the presentence investigation report, the trial court merged counts two and three into count one (aggravated battery of a child, a class X felony) and sentenced defendant to 12 years' imprisonment. This appeal followed.

¶ 62                                     ANALYSIS

¶ 63    On appeal, defendant raises two challenges to the sufficiency of the evidence. First, he maintains the State failed to prove beyond a reasonable doubt who or what caused Serenity's injuries. Second, he argues that the State failed to prove beyond a reasonable doubt that he knowingly caused great bodily harm. The State disagrees with both propositions. We first turn to set forth the standard of review in this case.

¶ 64                                 Standard of Review

¶ 65    The standard of review in challenging the sufficiency of the evidence is "whether, viewing the evidence in the light most favorable to the State, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Belknap*, 2014 IL 117094, ¶ 67 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The trier of fact, here the trial judge, is responsible for resolving conflicts in the testimony, weighing the evidence, and

drawing reasonable inferences from basic facts to the ultimate facts. *People v. Brown*, 2013 IL 114196, ¶ 48. Accordingly, this court will not retry the evidence or substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or credibility of witnesses. *Id.* A reviewing court will not reverse a criminal conviction unless the evidence is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 66 In this instance, defendant was convicted of aggravated battery of a child. A defendant commits aggravated battery of a child when, among other things, the defendant is 18 years old or older and knowingly, and without legal justification, causes great bodily harm to a child under 13 years old. 720 ILCS 5/12-3.05(b)(1) (West 2016). Here, no issue is raised concerning defendant's age or Serenity's age. Defendant maintains that the evidence was insufficient to demonstrate who and what caused the injuries and that he did not knowingly cause Serenity great bodily harm.

¶ 67                                    Forfeiture

¶ 68 Prior to addressing defendant's claims, however, we address the issue of forfeiture. Defendant brings to this court's attention for the first time on appeal various medical articles discussing shaken baby syndrome. The State notes that these articles were not discussed before the trial court and defendant admits as much but nonetheless requests, we review these secondary sources for the "limited purpose" of informing the court that Dr. Abern's opinions "find support in the medical community." We, however, decline to review these secondary sources in conjunction with our review of the judgment and conviction in this case. These articles were not submitted into evidence during the trial nor were they discussed by Dr. Abern or Dr. Denev. Thus, these articles were not considered by the trial court in rendering its judgment. Indeed,

consideration of these articles on appeal—particularly to support and corroborate Dr. Abern's opinions—would be improper. See *People v. Mehlberg*, 249 Ill. App. 3d 499, 530-32 (1993) (the defendant's claim that bar journal, law review, and other articles were offered to assist the reviewing court in reviewing issues related to a complicated, technical, and newly emerging scientific field were rejected, finding instead that they were offered in "an attempt to interject expert-opinion evidence into the record to impeach the expert testimony" of the State's witnesses, where such materials were "never subject to cross-examination by the State" and were "never considered by the trial court."); Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (appellate arguments are to be based on matters and evidence contained in the record on appeal). Having found this contention forfeited, we now turn to address the sufficiency of the evidence.

¶ 69                                Sufficiency of the Evidence

¶ 70    Failure to Prove Beyond a Reasonable Doubt Who or What Caused Serenity's Injuries

¶ 71    On appeal, defendant raises numerous arguments as to why the State's evidence was insufficient as to the cause of Serenity's injuries. First, defendant asserts that Dr. Abern's testimony casts reasonable doubt on the State's shaken baby syndrome theory. Second, defendant asserts that Dr. Denev failed to provide a shaken baby syndrome diagnosis with sufficient certainty. Third, defendant observes that Dr. Denev admitted it was possible that Serenity suffered her injuries days before she arrived at the hospital and that Dr. Denev failed to take into consideration the symptoms of subdural hematoma which Serenity exhibited prior to her admission to the hospital, including her fussiness and trouble breathing. Fourth, defendant maintains that the fact Serenity had BEH made her more susceptible to shaken baby type injuries as the result of accidental trauma. He continues that even if the injuries were non-accidental, the BEH made it so that the trauma could have been of such little force that it would not be probative

of any knowing battery. Defendant also asserts that Dr. Denev failed to take into account the fact that the fluids drained from Serenity's head at the time of the emergency room treatment was clear rather than red. Such clear fluid, he suggests, indicates excess cranial fluid which would make her susceptible to subdural hemorrhage in the absence of being forcefully shaken. Lastly, defendant argues that the trial court's finding that defendant caused Serenity's injuries by swinging her "pretty hard" had no basis in the record and therefore requests this finding be stricken.

¶ 72    In response, the State maintains that this court must give deference to the fact finder's weighing of the credibility of the medical experts and in this case the fact that the trial court found Dr. Denev's testimony to be credible and that Dr. Abern's testimony was not credible. The State maintains that Dr. Denev did come to a definitive conclusion regarding the cause of Serenity's injuries—that they were due to non-accidental trauma. Regarding the clear fluid noted by Dr. Bertoglio, the State asserts that these notes indicated that the cerebral spinal fluid was "inclusive of a subdural hematoma" and the subsequent lab testing of the clear fluid indicated it was actually "blood-tinged." As to the timeframe of Serenity's injuries, the State contends that Dr. Denev found Serenity's subdural hematoma was "acute" and happened within hours of his examination of her. The State notes that Dr. Abern agreed that Serenity's subdural hematoma was "acute" and could have occurred "from time 0 when the injury occurred *** up to four or five days" previous. The State argues that while Dr. Denev and Dr. Abern testified that Serenity's injuries could have been inflicted days before, their testimony did not exclude the fact that the injuries could have been caused while defendant was watching her. The State further asserts that a seven-month-old's general fussiness is not in and of itself indicative of the onset of a subdural hematoma, especially considering defendant's own statement that Serenity could have

been fussy as she was teething at the time. The State maintains that the testimony was clear that Serenity was a happy and healthy baby prior to being left in defendant's care. The defendant even admits as much in his interview with the detectives. Lastly, the State asserts that, taken in its full context, the trial court's statements demonstrate that the "swinging" action was not the sole cause of Serenity's injuries, but that defendant was minimizing his actions in characterizing them as "swinging." In all, the State maintains that, viewing the evidence in the light most favorable to the prosecution, the trial court's determination that defendant caused Serenity's injuries was proven beyond a reasonable doubt.

¶ 73    We find that the evidence was sufficient to find defendant caused Serenity's injuries. In reviewing the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (Emphasis in original.)." *People v. Bishop*, 218 Ill. 2d 232, 249 (2006) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A court may infer injury based upon circumstantial evidence. *Bishop*, 218 Ill. 2d at 250. Circumstantial evidence is proof of facts and circumstances from which a trier of fact may make reasonable inferences. *In re Gregory G.*, 396 Ill. App. 3d 923, 929 (2009). Circumstantial evidence alone can sustain a conviction. *People v. Gomez*, 215 Ill. App. 3d 208, 216 (1991).

¶ 74    Here, the evidence established that prior to Serenity being left in defendant's care on January 12, 2017, she was happy and healthy. Indeed, defendant even stated to detectives that Serenity was doing "fine," and was "happy, joyous, and free." Moreover, the evidence demonstrated that while Serenity was born at 36 weeks and was underweight at birth, after she was released from the hospital, she developed no significant medical history. The acid reflux she suffered from as a two-month-old infant was treated and resolved prior to January 12, 2017, and

even Dr. Abern testified that acid reflux was normal. She was assessed by a physician at her regular check-ups and was not on medication at the time of her injuries. While Julie testified that Serenity had a mild fever a few nights prior to January 12, 2017, she also testified that the fever went away, and Serenity was healthy when she left her on January 12, 2017.

¶ 75    Defendant contends that Serenity's fussiness was evidence that she was suffering from the subdural hematoma prior to being left in his care. Fussiness, however, is just one symptom of a subdural hematoma and there is a myriad of reasons why a seven-month-old might be fussy—including, as defendant himself suggested, that she may be teething. Moreover, the testimony from Julie and Caroline establishes that prior to being left in the defendant's care Serenity was a normal, healthy baby on January 12, 2017. Caroline testified that at 3:30 a.m. that morning, Serenity was "whimpering" but after she changed her diaper Serenity was calm and content. Prior to Julie leaving in the afternoon of the same day, she stated that Serenity was not acting fussy. Thus, neither of the witnesses who resided with defendant corroborated his version of events that Serenity was acting fussy earlier that day.

¶ 76    In addition, defendant was the only person present when Serenity stopped breathing and became limp. At his first interview defendant informed the detectives that he tripped and dropped Serenity on the living room floor. Then he tells them that he tripped and dropped Serenity on the living room floor and when he lands on top of her his head hits her head. At the third interview, after learning the extent of Serenity's injuries from the officers, defendant admits that he lied—he did not trip and drop Serenity in the living room. Defendant, instead, stated he dropped her in her crib, and she stopped breathing. He then picked her up and moved her around from side-to-side "like a jolt" four times. He admitted he did this "pretty hard" but not with all his strength. He denied shaking Serenity and denied intentionally hurting her. During the fourth

and final interview, defendant stated he was with Caleb and Serenity in the living room watching television. He was trying to feed Serenity a bottle, but she was crying and he "didn't know how to handle it and whatnot. So, I did something stupid that I didn't want to do. I'm, I'm sorry for doing it." He then admitted that he dropped Serenity next to the crib and then again when he placed her in the crib. He denied dropping Serenity on purpose.

¶ 77    The trial court found that defendant's videotaped interviews demonstrated "the classic shifting sands of the guilty mind of the defendant where he minimizes his activities, his actions the best he can each and every interview. But with each one a little bit more of the truth seems to come out." It is not the function of this court to retry a defendant. *People v. Steidl*, 142 Ill. 2d 204, 226 (1991). It is also well established that the determination of the weight to be given to the evidence, its credibility, and the reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact. *Id.* We see no reason to discredit the trial court's consideration of defendant's videotaped statements.

¶ 78    We further observe that the medical testimony, which detailed the extent of Serenity's injuries, overwhelmingly supported the State's theory of this case. Dr. Denev testified that when Serenity was admitted to the hospital she had "gasping and agonal respirations" as well as "posturing and seizures." These were symptoms of a possible brain injury. Contrary to defendant's argument, Dr. Denev did take into consideration the symptoms of subdural hematoma that Serenity exhibited prior to her admission in the hospital. Dr. Denev testified that Serenity had been feverish a few nights before and that Julie had administered Tylenol and the fever went away. He also testified that he was informed that Serenity had been fussy prior to admission. While defendant argues on appeal that Serenity had trouble breathing in the days prior to her hospital admission, this is belied by the record which is devoid of any reference to

trouble breathing prior to being left in defendant's care.

¶ 79    Dr. Denev then conducted a battery of tests including CAT scans, x-rays, and blood work, which ruled out accidental trauma as the cause of Serenity's injuries. Instead, these tests revealed that Serenity had a right subdural hematoma and a small left parenchymal. The CAT scan also indicated that the subdural hematoma was acute, having developed anywhere from minutes to two days prior to her admission to the hospital. Although defendant argues that Dr. Denev's timing of Serenity's injuries supports his claim that he did not cause the injuries, this argument ignores the fact that Dr. Abern also testified that Serenity could have been injured minutes prior. Accordingly, the experts' testimony regarding the timing of the injuries is consistent and does not exclude defendant from having caused Serenity's injuries. Further, defendant contends that Dr. Denev failed to consider the fact that clear fluid was removed from Serenity's skull. This argument, however, misstates the evidence where this "clear fluid" was removed during the second surgery—after Dr. Bertoglio treated the subdural hematoma—which in fact did contain blood.

¶ 80    The medical evidence further established that Serenity had bilateral retinal hemorrhages. According to Dr. Denev, who the trial court found to be credible, retinal hemorrhages in pediatric patients are most likely caused by shaken baby syndrome. Thus, Dr. Denev concluded based on Serenity's presentation and his clinical experience Serenity's injuries were nonaccidental and caused by shaken baby syndrome. Dr. Denev further explained that Serenity's collective injuries could not have resulted from a fall alone—and indeed Serenity did not have any external injuries which would be consistent with a fall. As Dr. Denev opined, Serenity's injuries could only be caused through moderate to significant force being exerted on her from the acceleration and deceleration forces that occur when a baby is shaken.

¶ 81    Defendant maintains that Dr. Denev failed with sufficient certainty to render a shaken baby syndrome diagnosis in this case.  The record, however, is clear that Dr. Denev opined to a reasonable degree of medical certainty that Serenity's injuries were caused by nonaccidental trauma and he diagnosed Serenity with shaken baby syndrome.  While Dr. Denev may have used words like "probably" or "most likely" during his testimony, it is evident when considering his testimony in context that he did offer a medical opinion that Serenity's injuries were so severe that they could not have been caused by a mere accident alone—particularly when her brain injuries presented in conjunction with the bilateral retinal hemorrhages.  This conclusion is expressly supported by the trial court's finding that Serenity's injuries were caused by being shaken back and forth.  See *People v. Campbell*, 146 Ill. 2d 363, 375 (1992) (a reviewing court may not substitute its judgment for that of the trier of fact when evaluating the credibility of the witnesses, resolving conflicts and inconsistencies in the evidence, and determining the weight to afford, and the inferences to be drawn, from the evidence).  Furthermore, in light of all the evidence presented at trial, the use of words like "probably" or "most likely" by a medical expert do not render Serenity's cause of death so improbable as to create a reasonable doubt of defendant's guilt.  *People v. Swart*, 369 Ill. App. 3d 614, 634 (2006).

¶ 82    We also observe that defendant's own expert, Dr. Abern, did not unequivocally opine on the cause of Serenity's injuries.  He stated, in fact, that "[t]he diagnosis was subdural hematoma, but I can't tell you how.  It could be abusive.  It could be non-abusive with BEH."  Notably, in contravention of defendant's argument that Serenity had BEH and therefore she was more susceptible to "shaken baby type injuries" as a result of accidental trauma, we observe that no medical expert testified that Serenity was diagnosed with BEH nor did any medical records so find.  Although Dr. Denev acknowledged that Dr. Bertoglio's note indicated some space in the

dura, he testified only that Serenity could "possibly" have had this pre-existing medical condition. In turn, Dr. Abern only testified as to the indications that Serenity *may* have had BEH and did not conclusively testify that Serenity suffered from BEH.

¶ 83 In situations where medical experts are called to testify, their comparative credibility and the weight to be accorded to their testimony is determined by the trier of fact. *People v. Klein*, 2015 IL App (3d) 130052, ¶ 101. Here, the trial court found the testimony of defendant's medical expert, Dr. Abern, not to be credible and Dr. Denev's testimony credible. Dr. Abern never examined Serenity and is not actively treating patients. The trial court thus concluded that Serenity's injuries did not result from accidental trauma but were caused due to a moderate to significant degree of force being exerted upon Serenity and that her injuries were not consistent with defendant's version of the events. We must allow the trial court's reasonable inference from the evidence that defendant's denials are incredible, and that defendant inflicted Serenity's injuries.

¶ 84 Whether Defendant Knowingly Caused Great Bodily Harm

¶ 85 Defendant next asserts that the evidence was insufficient to prove beyond a reasonable doubt that he knowingly caused great bodily harm. Defendant raises a myriad of arguments in support. First, he maintains that because there was no evidence he caused great bodily harm, it was impossible for the trial court to rationally infer that he was consciously aware that such conduct was practically certain to cause great bodily harm. Second, he argues that the only evidence of any intentional act came from Dr. Denev who testified that "moderate" force while handling Serenity could have caused her injuries. Without citing any supporting case law, defendant argues this "moderate" force does not equal the requisite intent for aggravated battery. Third, defendant asserts he was not consciously aware that the action he is alleged to have

committed was practically certain to cause great bodily harm and the State presented no evidence of his state of mind.

¶ 86    The State disagrees with each of these contentions and asserts the trial court correctly inferred from the circumstantial evidence that defendant was consciously aware that his actions were practically certain to cause bodily harm.  First, the State maintains that a defendant does not need to admit knowledge for a trier of fact to find the defendant acted knowingly.  Indeed, the severity of the violence necessary to cause the injury as testified to by a medical expert is sufficient to sustain an inference of knowledge of great bodily harm and the evidence here demonstrated defendant violently shook and dropped Serenity.  Second, the State asserts that Dr. Denev's testimony regarding the force necessary to cause Serenity's injuries was sufficient to establish defendant's mental state where he described it as "moderate to significant" force and likened it to the force necessary for an adult to sustain whiplash in an automobile accident. Lastly, the State maintains that the circumstantial evidence presented established defendant's knowing mental state.  The State points to defendant's inexperience as a caretaker along with his anger and substance abuse issues as support for the inference that he became frustrated with Serenity when she would not stop crying and he handled her in a manner he knew would be practically certain to cause her great bodily harm.

¶ 87    A defendant knowingly causes a result when he is consciously aware that the result is practically certain to be caused by his conduct.  720 ILCS 5/4-5(b) (West 2016).  The element of knowledge is rarely susceptible of direct proof.  *People v. Nwosu*, 289 Ill. App. 3d 487, 494 (1997).  Accordingly, where a defendant denies that he knowingly brought about the proscribed result, the State must prove the defendant's mental state through circumstantial evidence.  *People v. Phillips*, 392 Ill. App. 3d 243, 259 (2009).  As previously discussed, "[c]ircumstantial

evidence is proof of certain facts and circumstances from which the trier of fact may infer other connected facts that human experience dictates usually and reasonably follow." *People v. White*, 2016 IL App (2d) 140479, ¶ 37.

¶ 88    In assessing whether a defendant acted with knowledge, we note that a defendant is presumed to intend the probable consequences of his actions and need not admit that he acted knowingly. *People v. Lind*, 307 Ill. App. 3d 727, 735 (1999). "[I]ntent may be inferred (1) from the defendant's conduct surrounding the act and (2) from the act itself." *Phillips*, 392 Ill. App. 3d at 259. In the context of aggravated battery of a child, when determining whether knowledge can be inferred from circumstantial evidence, our appellate courts have considered the nature and degree of the severity of the victim's injuries (see *People v. Renteria*, 232 Ill. App. 3d 409, 417 (1992)); the circumstances surrounding the incident (see *id.*); and whether the defendant's version of events is inconsistent with the severity of the injuries (see *People v. Ripley*, 291 Ill. App. 3d 565, 569 (1997)).

¶ 89                         Nature and Severity of the Injuries

¶ 90    The medical testimony was clear that when Serenity was admitted to the emergency room she had developed "gasping and agonal respirations" as well as "posturing and seizures" indicative of a brain injury. A subsequent CAT scan, as interpreted by a radiologist, found an acute right subdural hematoma and a small left parenchymal. An ophthalmologist diagnosed Serenity with bilateral retinal hemorrhages. And while Dr. Bertoglio noted some space inside Serenity's skull, no physician ever diagnosed Serenity with BEH. Indeed, Dr. Denev, in diagnosing Serenity with shaken baby syndrome, did not find this fact to be inconsistent with his diagnosis. According to Dr. Denev, whom the trial court found to be the credible medical expert, even if Serenity did have BEH this would only explain the subdural hematoma, not the bilateral

retinal hemorrhages which are indicative of shaken baby syndrome. Only a moderate to significant acceleration/deceleration force akin to what an adult would experience in an automobile accident would have caused Serenity's collective injuries. These injuries were profound and would not have occurred absent abuse. See *id.*

¶ 91                    The Circumstances Surrounding the Incident

¶ 92    The evidence demonstrated that defendant, who was not the twins' biological parent, had been left alone to care for the babies on a few occasions. On January 12, 2017, when Julie left the babies were "happy, joyous, and free" according to defendant. Julie and Caroline both testified that Serenity was healthy prior to being left in defendant's care. Once Julie left, however, Serenity began crying and defendant—no matter how hard he tried—could not soothe Serenity. Defendant had also smoked marijuana prior to taking care of the children, was on medication for anger management, and had substance abuse issues.

¶ 93                    Whether the Defendant's Version of Events is Inconsistent

                                With the Severity of the Injuries

¶ 94    During his interviews with the detectives, defendant stated numerous versions of the events of January 12, 2017. First, defendant stated he discovered Serenity in her crib unresponsive and not breathing. He then stated he had slipped and fallen on top of Serenity because his leg had given out. In another interview, he stated he dropped Serenity on the hardwood floor after slipping on a baby play gym and his forehead hit her forehead. In his third interview, defendant stated he dropped her onto the hardwood floor, that she stopped breathing, and he picked her up and swung her back and forth four times and then he dropped her into her crib onto her head. In his final interview, defendant stated he dropped Serenity on her head on the hardwood floor next to the crib, and then dropped her on her head in her crib. Defendant

admitted that he swung Serenity four times "like a jolt." He also stated multiple times that he did "something stupid." One can reasonably infer from this language that defendant was aware of the severity of Serenity's injuries and that his actions were wrongful. See *People v. Kibayasi*, 2013 IL App (1st) 112291, ¶ 46.

¶ 95    Defendant's expert, Dr. Abern, did not address defendant's actions in relation to Serenity's injuries because he only reviewed the medical records. Dr. Denev, however, debunked defendant's explanation of Serenity's injuries when he testified, in his expert opinion, that (1) there was an absence of any external injury consistent with being dropped twice and (2) the amount of force necessary to cause the injuries was moderate to significant and akin to the force necessary for an adult to sustain whiplash in an automobile accident. Dr. Denev expressly testified that these injuries could not have been sustained from a fall or from being dropped in a crib or from being swung as defendant described. Instead, these injuries were caused by acceleration/deceleration forces known as shaken baby syndrome. See *id.* ¶ 49 (medical testimony is sufficient to prove injuries were knowingly inflicted).

¶ 96    Based on these facts and the reasonable inferences that they create we find a rational trier of fact could infer defendant must have known of the probable consequences of his actions. Indeed, defendant also outcried to Caroline to seek medical assistance which demonstrated he was aware that he had inflicted injuries on the child. See *Renteria*, 232 Ill. App. 3d at 418. Moreover, Serenity's injuries are starkly inconsistent with defendant's conflicting versions of what happened. A rational trier of fact could believe defendant was attempting to hide the truth from the investigating detectives because he knew his actions were dangerous to a baby. See *People v. Rader*, 272 Ill. App. 3d 796, 804-05 (1995). The disparity in size between defendant and Serenity also could reasonably lead a rational trier of fact to find that defendant must have

been aware that any violent shaking by him of a tiny infant would have the substantial probability of causing great bodily harm. See *id.* Accordingly, we find the evidence was sufficient to establish defendant knowingly caused Serenity great bodily harm.

¶ 97     In reaching this conclusion, we find the reasoning employed in *Rader* to be instructive. There, the defendant, who was a loving and caring individual toward other children, testified that he never intended to harm his four-and-a-half-month-old son. *Id.* at 798, 800-01. However, the evidence established that the son's injuries were severe and permanent, consistent with shaken baby syndrome, and could have been caused only by severe and repetitive shaking. *Id.* at 804-05. Additionally, the baby's severe injuries were inconsistent with the defendant's version of what transpired when his son was harmed, which suggested that the defendant was attempting to hide the truth from the police because he knew his acts were dangerous when performed on a baby. *Id.* at 805. Based on the severity of the baby's injuries, the court concluded that a rational trier of fact could infer that the defendant must have known that there was a substantial probability that the defendant's actions could harm his son. *Id.*

¶ 98     Here, as in *Rader*, a rational trier of fact could infer defendant's guilt from the disparity in Serenity's and defendant's sizes, strength, and ages; the fact that Serenity's injuries would not have been sustained in the absence of substantial force being applied through shaking; and the fact that defendant's recounting of the events that led to Serenity's injuries—that he swung her around four times and dropped her twice—was completely inconsistent with Serenity's injuries. This, as in *Rader*, suggests that defendant was attempting to hide the truth from authorities precisely because he knew that his actions were dangerous to Serenity.

¶ 99     We have also considered defendant's argument that the trial court dismissed the knowledge element of the offense when it found that you "take your victim as [you] find them,"

We disagree with defendant's interpretation of the trial court's ruling. As stated above, our review of all the evidence—circumstantial or otherwise—establishes defendant did commit the offense of aggravated battery of a child with the requisite mental state.

¶ 100   After viewing the evidence in the light most favorable to the State, we find a rational trier of fact could find beyond a reasonable doubt that defendant caused great bodily harm to Serenity.

¶ 101                                            CONCLUSION

¶ 102   For the reasons stated above, we affirm the judgment of the circuit court of Cook County.

¶ 103   Affirmed.